**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE JOHNS HOPKINS UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-525 (LS) (SRF) |
| | ) | |
| ALCON LABORATORIES, INC. and | ) | **REDACTED** |
| ALCON RESEARCH, LTD.,  | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

## ALCON'S RESPONSE TO JHU'S MOTIONS IN LIMINE NOS. 1-8

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
skraftschik@mnat.com

OF COUNSEL:

William A. Rakoczy
Paul J. Molino
Deanne M. Mazzochi
John D. Polivick
Jeffrey A. Marx
Rachel P. Waldron
Gregory A. Duff
Kevin P. Burke
Erin M. Forbes
Katie A. Boda
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 222-6300

*Attorneys for Defendants Alcon Laboratories,
Inc. and Alcon Research, Ltd.*

Original Filing Date:  May 29, 2018
Redacted Filing Date:  June 5, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.   Response to JHU MIL #1:  Pointing Out JHU Suffered No Real-World Harm Directly
     Bears On Issues That JHU Chose To Raise. ........................................................ 1

     A.   JHU Is The Party Insisting It Was Harmed. ........................................... 1

     B.   JHU, Not Alcon, Insists On Placing B&L At The Negotiating Table. ................... 1

     C.   Non-Infringing Product Sales Alone Are Not Enough To Warrant A
          Royalty. ............................................................................... 2

     D.   JHU's Non-Harm Is Relevant To Other Defenses. ...................................... 4

II.  Response to JHU MIL #2:  Alcon Can Present Relevant Evidence That, *E.g.*, Directly
     Rebuts Or Contradicts JHU's Assertions On Its Motives; Alleged Praise For The
     Invention And/Or Dr. De Juan; And Its Royalty Demands. .............................. 4

     A.   The 1995 AMA Report. ................................................................. 5

     B.   The Evidence Contradicts JHU's Poverty Pleas. ....................................... 7

     C.   Additional Issues. ..................................................................... 9

III. Response to JHU MIL #3:  Dr. Donald D'Amico Should Be Permitted To Testify About
     The Prior Art And Background Facts Disclosed In His Expert Report. ................... 10

     A.   Dr. D'Amico Can Opine Consistent With His Expert Report On '848
          Patent/Prior Art Comparisons Relating To Reasonable Royalty Issues. .............. 10

     B.   Dr. D'Amico's Disclosed Opinions Are Timely; Involve Royalty Issues
          For The Jury To Decide; Are Probative; And Are Not
          Redundant/Prejudicial. ............................................................... 12

IV.  Response to JHU MIL #4:  Alcon Can Show That The Asserted Claims Cover Only
     Certain Product Uses, Not The Products Themselves Or All Product Uses. ............. 12

     A.   JHU Again Misstates The Relevant Law And Facts. ................................... 13

     B.   The "Use Made Of The Invention" By The Accused Infringer. ......................... 14

     C.   JHU's Mr. Napper Paints A Misleading Picture Of JHU's Patent Claims;
          Alcon Needs JHU's Abandoned Patent Application To Correct This. ................... 15

     D.   Alcon's Evidence Avoids Unfair Prejudice, Confusion, And Counters
          JHU's Efforts To Mislead The Jury When Telling Its Story Of The
          Invention. ............................................................................ 17

i

E.       Independent Admissibility. ................................................................................ 18

V.     Response to JHU MIL #5:  Alcon Can Present Relevant, Probative Evidence Concerning Whether Non-Infringing Uses Are Substantial. ............................................................... 18

     A.       The Importance Of Non-Infringing Uses Is Relevant To Whether Such Uses Are "Substantial." ....................................................................................... 18

     B.       JHU Has Argued The Comparative Importance Of Surgical Methods. ............... 19

VI.    Response to JHU MIL #6:  Alcon Can Present The PAT Survey Data To The Jury. ...... 20

     A.       The PAT Surveys' Numerical Results Can Help Make The Jury's Qualitative Assessment—Is A Vit-Buckle Use "Substantial"—More Or Less Likely. ............................................................................................................ 20

     B.       JHU Is Not Prejudiced If Jurors See The Survey Respondents' Actual Answers. ................................................................................................................ 23

VII.   Response to JHU MIL #7:  Documents From Dr. Ryan's Retrospective Study Were Produced In Response JHU's Requests, Are Relevant, And Not Prejudicial. ................. 24

     A.       Dr. Ryan's Study And The Disputed Documents. ................................................ 24

     B.       Dr. Ryan Complied With Rule 26 And JHU's Shifting Demands. ...................... 25

     C.       There Is No Prejudice To JHU ............................................................................. 26

VIII.  Response to JHU MIL #8:  Alcon Should Be Permitted To Introduce Its Own Patents And Testimony Concerning Those Patents And The Accused Products. ......................... 27

     A.       Procedural Background. ........................................................................................ 27

     B.       It Is Not Confusing Or Misleading To Admit Alcon's Patents Into Evidence; They Are Relevant Evidence Underlying Various Licenses, Alcon Product Descriptions, And Fact Witness Work; And Alcon's Experts Cite Them. ................................................................................................. 29

     C.       An Appropriate Jury Instruction Can Resolve JHU's Alleged Prejudice. ............. 31

IX.    CONCLUSION. ............................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

### Federal Cases

*Aqua Shield v. Inter Pool Cover Team,*
    774 F.3d 766 (Fed. Cir. 2014) ................................................. 2

*AstraZeneca AB v. Apotex Corp.,*
    782 F.3d 1324 (Fed. Cir. 2015) ................................................. 2

*Beech Aircraft Corp. v. Rainey,*
    488 U.S. 153 (1988) ................................................. 18

*Bland v. PNC Bank, N.A.,*
    15cv1042, 2016 WL 10536026 (W.D. Pa. Dec. 30, 2016) ................. 18

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
    576 F.3d 1348 (Fed. Cir. 2009) ................................................. 17

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,*
    C.A. No. 09-290, 2012 WL 5416440 (W.D. Pa. Nov. 2, 2012) ............. 31

*Dowagiac Mfg. Co. v. Minn. Moline Plow Co.,*
    235 U.S. 641 (1915) ................................................. 3

*DSU Med. Corp. v. JMS Co.,*
    471 F.3d 1293 (Fed. Cir. 2006) ................................................. 13

*Eidos Display, LLC v. Chi Mei Innolux Corp.,*
    Civil Action No. 6:11-CV-00201-JRG, 2018 WL 1156284 (E.D. Tex. Mar. 5, 2018) ............. 4

*Ericsson, Inc. v. D–Link Sys., Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014) ................................................. 15

*Finjan, Inc. v. Sophos, Inc.,*
    C.A. No. 14-cv-01197-WHO, 2016 WL 4560071 (N.D. Cal. Aug. 22, 2016) ................. 31

*Fonar Corp. v. Gen. Elec. Co.,*
    107 F.3d 1543 (Fed. Cir. 1997) ................................................. 16

Garretson v. Clark,
    111 U.S. 120 (1884) ................................................. 15

*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................. 6, 10, 16

*Glaros v. H.H. Robertson Co.,*
    797 F.2d 1564 (Fed. Cir. 1986) ................................................. 31

*GlaxoSmithKline LLC v. Teva Pharm. USA, Inc.*,
   C.A. No. 14-878-LPS-CJB, 2018 WL 1517687 (D. Del. Mar. 8, 2018) ................................... 3

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ...................................................................................................... 13

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   438 F.3d 1354 (Fed. Cir. 2006) ...................................................................................... 4

*Goodman v. Pa. Tpk. Comm'n*,
   293 F.3d 655 (3d Cir. 2002) .............................................................................. 5, 20, 23

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S.Ct. 1923 (2016) ....................................................................................................... 4

*i4i Limited Partnership v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ................................................................................... 17, 19

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
   681 F.3d 1323 (Fed. Cir. 2012) .......................................................................... 13, 19, 20

*In re King*,
   801 F.2d 1324 (Fed. Cir. 1986) ...................................................................................... 14

*In re: Tylenol (Acetominophen) Mktg., Sales Practices, and Products Liab. Litig.*,
   2:12-cv-07263, 2016 WL 4039267 (E.D. Pa. July 27, 2016) .................................... 8

*Joy Techs., Inc. v. Flakt, Inc.*,
   6 F.3d 770 (Fed. Cir. 1993) ............................................................................................ 17

*Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*,
   Civil No. 12-1369, 2017 WL 3140798 (W.D. Pa. July 25, 2017) ............................. 12

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
   134 S. Ct. 2111 (2014) ...................................................................................................... 3

*Nassau Precision Casting Co. v. Acushnet Co.*,
   566 F. App'x 933 (Fed. Cir. 2014) .................................................................................. 17

*Oxbo Int'l Corp v. H&S Manufacturing Co.*,
   C.A. No. 15-cv-292-jdp, 2017 U.S. Dist. LEXIS 87649 (W.D. Wis. June 2, 2017)................. 31

*Pallin v. Singer*,
   36 U.S.P.Q.2d 1050 (D. Vt. 1995) .................................................................................... 5

*Perricone v. Medicis Pharm. Corp.*,
   432 F.3d 1368 (Fed. Cir. 2005) ...................................................................................... 14

*Smith v. Ford Motor Co.*,
  215 F.3d 713 (7th Cir. 2000) ................................................................... 11

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ................................................................................. 19

*St. Clair Intellectual Prop. Consultants, Inc. v. Acer, Inc.*,
  935 F. Supp. 2d 779 (D. Del. 2013) ......................................................... 12

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012) ............................................................... 13

*Tyco Healthcare Grp. LP v. Biolitec, Inc.*,
  No. C-08-3129 MMC, 2010 WL 3324893 (N.D. Cal. Aug. 23, 2010) ................... 19

*U.S. v. Chapman*,
  209 F. App'x 253 (4th Cir. 2006) ............................................................. 30

*U.S. v. Georgiou*,
  777 F.3d 125 (3d Cir. 2015) ....................................................................... 8

*U.S. v. McCluskey*,
  954 F. Supp. 2d 1224 (D. N.M. 2013) ....................................................... 23

*U.S. v. Starnes*,
  583 F.3d at 196 (3d Cir. 2009)....................................................... 20, 21, 23

*Veeco Instruments Inc. v. SGL Carbon, LLC*,
  No. 17-CV-2217 (PKC), 2017 WL 5054711 (E.D.N.Y. Nov. 2, 2017) ................... 19

*VirnetX v. Cisco Systems*,
  767 F.3d 1308 (Fed. Cir. 2014) ......................................................... 10, 15

*Vita-Mix Corp. v. Basic Holding, Inc.*,
  581 F.3d 1317 (Fed. Cir. 2009) ............................................................... 21

*VSI Holdings, Inc. v. SPX Corp.*,
  03-cv-70225, 2005 WL 5980804 (E.D. Mich. Apr. 12, 2005) ...................... 9

*Ward v. Branch Banking & Tr.*,
  C.A. No. ELH-13-1968, 2017 WL 2242659 (D. Md. May 22, 2017) ................... 30

*Warner-Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003) ............................................................... 13

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
  778 F.3d 1365 (Fed. Cir. 2015) ..................................................... 2, 3, 16

*Westchester Surplus Lines Ins. Co. v. Interstate Underground Warehouse & Storage, Inc.*,
   No. 16-00136-CV-W-HFS, 2017 WL 2313288 (W.D. Mo. May 18, 2017) ........................... 26

*Wonderland NurseryGoods Co. v. Thorley Indus., LLC*,
   C.A. No. 12-196, 2014 WL 241751 (W.D. Pa. Jan. 22, 2014) ................................................. 31

## Federal Statutes

35 U.S.C. § 102 ........................................................................................................................ 14

35 U.S.C. § 271(b) ..................................................................................................................... 3

35 U.S.C. § 271(c) ..................................................................................................................... 3

35 U.S.C. § 284 ................................................................................................................... 13, 14

35 U.S.C. § 287(a) .................................................................................................................... 29

35 U.S.C. § 287(c) ............................................................................................................. 3, 9, 28

35 U.S.C. § 287(c)(1) ................................................................................................................. 5

35 U.S.C. § 287(c)(2)(A) ............................................................................................................ 9

35 U.S.C. § 292 ........................................................................................................................ 28

35 U.S.C. §202(c)(4) .................................................................................................................. 9

## Federal Rules

FED. R. CIV. P. 26 ..................................................................................................................... 25

FED. R. CIV. P. 26(a)(2) ............................................................................................................ 12

FED. R. EVID. 106 ..................................................................................................................... 18

FED. R. EVID. 402 ..................................................................................................................... 21

FED. R. EVID. 403 ..................................................................................................................... 23

FED. R. EVID. 702 ..................................................................................................................... 11

FED. R. EVID. 803(1) ................................................................................................................... 9

FED. R. EVID. 803(10) ................................................................................................................. 9

FED. R. EVID. 807 ....................................................................................................................... 9

FED. R. EVID. 902(5) ................................................................................................ 9

FED. R. EVID. 902(6) ................................................................................................ 9

**Other Authorities**

142 CONG. REC. S12023–01 (daily ed. Sept. 30, 1996) (statement of Sen. Frist) ......................... 5

JHU's motions *in limine* should be denied, as none of them warrant outright exclusion of evidence or theories; and/or cannot be addressed with an appropriate jury instruction.

## I.      Response to JHU MIL #1:  Pointing Out JHU Suffered No Real-World Harm Directly Bears On Issues That JHU Chose To Raise.

Alcon's lack-of-harm evidence is relevant, probative, and not unfairly prejudicial: ***JHU*** chose to interject harm—particularly Bausch & Lomb's ("B&L")—into the foundation of its willful infringement and remedy demands.

### A.      JHU Is The Party Insisting It Was Harmed.

JHU's own motion *in limine* insists that "Alcon's willful infringement has **harmed** JHU" through lost B&L license revenue; reputation; and impaired corporate sponsorships.[1]  (D.I. 348 at 3 n.2 (emphasis added)).[2]   While Alcon disputes this, Alcon cannot be hamstrung from showing JHU's (or B&L's) lack of real-world losses or harm from Alcon.

### B.      JHU, Not Alcon, Insists On Placing B&L At The Negotiating Table.

JHU's reasonable royalty theory puts B&L at the hypothetical negotiating table, and argues JHU must compensate B&L for 1) converting B&L's exclusive license to a non-exclusive one before granting Alcon a license; and 2) the "direct negative financial impact" (*i.e.*, harm) B&L's *product* sales suffer if JHU licensed Alcon.  (*See* Ex. 38, Am. Napper Rep. at 21, 45).

Alcon's evidence shows JHU need not pay B&L a license conversion premium: Alcon secured summary judgment of no direct infringement (*see* D.I. 294 at 24-26; D.I. 339), and neither JHU's nor B&L's right to exclude surgeons from performing the claimed *method* are

---

[1]  JHU conveniently ignores that both the Alcon Foundation and Alcon's corporate parent Novartis have sponsored JHU research and clinical trials over the years.

[2]  *See also* Ex. 37, JHU 3d Supp. Resp. to 1st Set Interrogs. at 30 ("***Defendants' infringement*** has caused JHU **harm** … there is a 'causal nexus [that] relates the alleged **harm** to the alleged infringement," and "there must be proof that the infringement causes the **harm**.'"), 33 (alleging Alcon engaged in "misconduct [that] has directly **harmed** JHU and B&L") (emphasis added). "Ex. __" references Exhibits to the Declaration of Erin M. Forbes in Support of Alcon's Response to JHU's Motions in Limine Nos. 1-8, filed concurrently herewith.

"harmed" by actions Alcon takes to sell its non-infringing products.  B&L cannot demand a price premium to surrender license "exclusivity" that does not cover Alcon's direct activity.

### C.  Non-Infringing Product Sales Alone Are Not Enough To Warrant A Royalty.

JHU asserts that its "[h]arm" is "not an element of damages measured by a reasonable royalty," and that relevant evidence must focus on the "value of what was taken." (D.I. 348 at 4).

On direct infringement, Alcon took no value—its products do not infringe the patented method.  Even if surgeons secure "value" from any infringement, 35 U.S.C. § 287(c) renders them immune from liability or damages.  The only cases that JHU relies on involve patents with product claims, not fully immune method claims.  *See, e.g.*, *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1368, 1377 (Fed. Cir. 2015) ('973 and '933 patents to spinal implants and surgical retractor instruments); *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 768, 770 (Fed. Cir. 2014) (pool enclosures); *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1328, 1334 (Fed. Cir. 2015) (pharmaceutical compositions).

JHU asserts that "Alcon's liability stems from" indirect infringement.  (D.I. 348 at 1-2). That is the beginning, not the end, of the analysis.  JHU conceded during the summary judgment proceedings that "the sale of the Accused Products alone cannot constitute the practice of the patented process even if those Accused Products are later used in the patented process." (*See* D.I. 294 at 27).  JHU now must prove that Alcon "made use of" the invention through acts *beyond merely selling a product capable of use in the patented method*.  This is the critical issue JHU has repeatedly sidestepped, including in wrongly accusing Alcon of proposing a legal rule that permits surgical method patents to be infringed "with impunity." (D.I. 348 at 3).

JHU wrongly asserts that if it finds a *single* surgeon has practiced the claimed method with Alcon's products (*id.* at 1), then it is "beyond question" (*id*. at 4) that it has satisfied its burden of proof to include *all* of Alcon's product sales in the reasonable royalty calculation.

That is not the law.[3]  Instead, for over a century courts have required proof on "the nature of the invention, its utility and advantages, and *the extent of the use* involved" in the damages analysis. *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 648 (1915) (emphasis added).

On inducement, JHU must show: (a) Alcon intentionally engaged in affirmative acts that (b) actually caused surgeons to directly infringe (beyond merely supplying instruments); *and then* demonstrate what independent value Alcon secured from the induced surgeon acts. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("where there has been no direct infringement, there can be no inducement of infringement under § 271(b)."). JHU cannot do this, when surgeons are immune from suit; and Alcon does not cause surgeons to perform surgery.[4]  If surgeons perform the method for reasons beyond Alcon (*e.g.*, because JHU's surgeons, experts, or Dr. de Juan encouraged them), Alcon's sales to such "infringers" is not grounds for awarding JHU damages.  *See GlaxoSmithKline LLC v. Teva Pharm. USA, Inc.*, C.A. No. 14-878-LPS-CJB, 2018 WL 1517687, at *5-7 (D. Del. Mar. 8, 2018).

As for contributory infringement, JHU must show that Alcon intended to make use of the invention by ensuring its products were "especially made … for use in an infringement" and could not constitute "a staple article … of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c).  Alcon's products are used exactly as-is to perform a vit-buckle[5] procedure that does not infringe; thus, they could not have been "especially made" to make use of the

---

[3] Nor is that the facts; fact disputes remain on *the extent* to which surgeons that purchase Alcon products actually use them to perform the patented method.  (D.I. 294 at 27).  JHU's expert admits that she uses Alcon's accused instruments to perform non-infringing vit-buckle surgeries with PVR patients. (Ex. 39, Haller Tr. 133:19-134:1).  No damages are due from Alcon for that.

[4] JHU has yet to identify <u>any</u> surgical method-only patent, which issued after § 287(c) was enacted, giving a patentee a product-based royalty from an instrument manufacturer merely because physicians used a method, and a manufacturer sold them products.  Even in *Warsaw*, for the disputed method claim, there was record evidence that MSD "specifically taught doctors to use the product during surgical procedures in an infringing manner."  778 F.3d at 1373.

[5] A "vit-buckle" procedure combines two other surgical procedures, the "vitrectomy" and "scleral buckle" procedures, in order to achieve the additive benefits of both procedures.

claimed invention.  Alcon thus can show that it committed no affirmative act designed to cause JHU any infringement harm.

The jury also should decide whether it is reasonable to expect *Alcon* to pay royalty for JHU's own choices, or acts JHU (or an inventor) encouraged.  JHU's inability to find any activity beyond Alcon's mere product sales that has harmed it or B&L—let alone caused a surgeon to indirectly infringe—is relevant; and independently probative on the question of the reasonableness of JHU's royalty demands.  *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1372-73 (Fed. Cir. 2006) (rejecting plaintiff's argument that the district court could presume that each sale of an accused product constituted an act of contributory or induced infringement); *Eidos Display, LLC v. Chi Mei Innolux Corp.*, Civil Action No. 6:11-CV-00201-JRG, 2018 WL 1156284, at *9-10 (E.D. Tex. Mar. 5, 2018) (holding a plaintiff "had failed to adduce any reliable evidence establishing that it suffered an injury as a result of [defendant's] indirect infringement" and therefore could not recover damages).

### D.    JHU's Non-Harm Is Relevant To Other Defenses.

JHU ignores that its indirect and willful infringement theories turn on Alcon's actual, specific intent at the time of the alleged infringement.  If Alcon never harmed JHU, it is entirely appropriate for a jury to expect that Alcon was not seeking to willfully target JHU by acting like a pirate.  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S.Ct. 1923, 1932 (2016).  Likewise, Alcon should be permitted to support its equitable estoppel defense by pointing out that JHU's lack of harm is why JHU was perfectly content to lie in wait for over ten years (while Alcon invested hundreds of millions in R&D efforts for its vitreoretinal product portfolio) and delay filing suit.

JHU's MIL #1 should be denied.

## II.    Response to JHU MIL #2:  Alcon Can Present Relevant Evidence That, *E.g.*, Directly Rebuts Or Contradicts JHU's Assertions On Its Motives; Alleged Praise For The Invention And/Or Dr. De Juan; And Its Royalty Demands.

JHU will present Dr. de Juan and others to wax poetic about his purported invention. JHU insists that it deserves an elevated royalty rate given the criticality of B&L's early-stage funding for the MADLAB; JHU's not-for-profit status; and corporate reputation to drive licensing revenue. JHU seeks to excuse its delay in filing suit because it had to consider whether filing suit was "in the best interests of the university." (Ex. 40, JHU Resp. to Interrog. 12 at 10).

JHU chose to open the door to its supposed pure motives; surgeon praise; and adherence to its university mission. Alcon should be permitted to challenge same with: (1) Report of Council on Ethical and Judicial Affairs from the 1995 Annual Meeting of the American Medical Association ("1995 AMA Report"); and (2) the huge volume of JHU's government research funding and not-for-profit teaching hospital mission to the extent it conflicts with its stated lawsuit enforcement rationales. Relevant evidence that puts the facts in their proper context is not unfairly prejudicial. *See Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) (Unfair "'[p]rejudice does not simply mean damage to the opponent's cause.'… the fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403." (citations omitted)).

### A.    The 1995 AMA Report.

In *Pallin v. Singer*, 36 U.S.P.Q.2d 1050, at *1 (D. Vt. 1995), one eye doctor sued another for infringing his cataract surgery method patent. Responding to medical community outcry—including the 1995 AMA Report—Congress precluded patentees from enforcing such patents at least against surgeons. *See* 35 U.S.C. § 287(c)(1); 142 CONG. REC. S12023–01 (daily ed. Sept. 30, 1996) (statement of Sen. Frist).[6] Both the law and the 1995 AMA Report confirm the anti-

---

[6] "Unlike innovations in medical drugs and devices, innovations in pure procedures—such as discovering a better way to suture a wound or set a broken bone—are constantly being made without the need of significant research investments," and "[a]llowing a doctor to enforce a patent on such improvements would have disastrous effects." *Id*. at S12023.

patent-enforcement culture by and amongst surgeons.

JHU asserts surgeons' widespread use of the claimed method shows the field recognized the value of the claimed method.  For example:

- JHU's expert, Dr. Haller, opines that the "overwhelming surgeon acceptance" of small-gauge surgery means surgeons would not use prior art techniques, and thus Alcon must be inducing infringement.  (Ex. 41, Haller Rep. ¶ 67).

- JHU's expert Dr. Awh contends that industry praise for the claimed method and Dr. de Juan is evidence of patent validity.  (D.I. 358 Ex. 4, June 2017 Awh Rep. ¶ 397).

Yet neither has evidence that *if* JHU or Dr. de Juan had imposed patent-driven barriers on surgeons' ability to perform the method (including on instrument availability), that surgeons still would use the method or think highly of Dr. de Juan.  In criticizing the enforcement of a stitch-free cataract incision, the 1995 AMA Report states that the "Council believes that it is unethical for physicians to seek, secure or enforce patents on medical procedures."  (D.I. 359 Ex. 4, 1995 AMA Rep. at 201, 206).  Alcon can ask JHU's physician experts whether they accept their peers' ethical standard as they support JHU enforcing this method patent; or whether their long-term friendships with Dr. de Juan (who recruited them to testify (Ex. 39, Haller Tr. 37:6-39:4)) trump those concerns.  JHU accepts using the report to challenge bias/credibility.  (D.I. 348 at 6).

Similarly, when it comes to JHU's expert Mr. Napper, he:

- (erroneously) insists that the '848 patent

- opines on the factors from *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), that specifically call for taking the "nature of the patented invention" into account (Ex. 38, Am. Napper Rep. at 58-63); and

- insists that JHU deserves a higher royalty; and that B&L should be at the hypothetical negotiating table because B&L supported MADLAB research with approximately [redacted] total over several years, a "significant investment" that necessitated licensing exclusivity; and that JHU depends on licensing revenue to support its institutional mission.  (*Id.* at 7-8, 23 [redacted] 24-25 [redacted]

████████████████████████████████████ 40-41
                                      48
                                      ███  *see also* D.I. 348 at 3 n.2).

The 1995 AMA Report directly rebuts this:  "[u]nlike the development of innovative medical instruments or pharmaceuticals," developing "medical processes usually relies on intellectual curiosity and creativity rather than the availability of capital for research and development," and the "need for outside funding costs that might require later recovery is generally less pressing than in the case of devices or pharmaceuticals."  (D.I. 359 Ex. 4, 1995 AMA Rep. at 205).

Alcon expects Ms. Wyskiel will opine[7] that JHU was harmed because it "can't maximize licensing revenue" and its partners expect to have patents to protect "the dollars that they put into developing and marketing *products*."  (Ex. 42, Wyskiel Tr. 126:7-127:2 (emphasis added); Ex. 40, JHU Resp. to Interrog. 12 at 8-9[8]).  Alcon can rebut this with the 1995 AMA Report, which differentiates between instrument patents and surgical method patents; and states that the former, not the latter, requires significant capital investment.  That JHU admits Ms. Wyskiel was unaware of the standards and rationales in the 1995 AMA Report making this distinction undermines the value and credibility of her original presumption.  Thus, the 1995 AMA Report is relevant to the issues of validity, damages and harm that JHU chose to place into dispute.

**B.    The Evidence Contradicts JHU's Poverty Pleas.**

JHU seeks to boost its royalty by approximately ███████ based in part on the premise that it is a not-for-profit institution, Alcon did not help fund JHU's research, and B&L would be given a far lower royalty rate given the value of its early stage funding support of JHU's

---

[7] Alcon seeks to exclude Ms. Wyskiel's improper opinions, *see* D.I. 351 at 1, 3.

[8] Asserting, "JHU's mission since its founding, has been the encouragement of research and the advancement of individual scholars.  JHU licenses the technology generated by its scholars to commercial entities.  Because JHU owns several thousand patents and because these patents are in such a wide variety of complex technology areas, JHU is unable on its own to practically monitor the commercial activities of every company doing business in the United States to determine whether those businesses are infringing JHU's patents."

MADLAB (about ███████ total over several years).  Alcon's response includes that JHU receives over $1 billion in research funding annually (including federal funds) (Ex. 42, Wyskiel Tr. 47:10-48:18), dwarfing the contribution B&L made years ago.

JHU's interrogatory response relevant to Alcon's equitable estoppel defense lauded JHU's moral purpose and purity: "JHU had to consider whether it was in the best interests of the university to initiate an expensive patent infringement suit" against Alcon, which caused the delay in filing suit.  (Ex. 40, JHU Resp. to Interrog. 12 at 8, 10).  JHU wants the jury to believe it is perpetually short of funds to advance its mission; and lacked money to sue the profit-driven, big corporation sooner.  (*See id.* at 8-9; *see also* citations to Ex. 38, Am. Napper Rep. in Section II(A), above; D.I. 348 at 3 n.2).  Since JHU invokes its philosophical introspections regarding its university mission as a rationale for how and why it acted, Alcon can present evidence JHU did not in fact comply; and for the jury to consider whether JHU undermines its poverty pleas when it has access to over $1 billion in annual funding; a massive patent portfolio available for licensing; and spent ███████ buying Alcon accused instruments.  Since JHU opened the door to put its size, wealth and mission in play—and plainly wants to set up a David vs. Goliath scenario to gain juror sympathy—Alcon should be permitted to present evidence that JHU is no "David" but is in fact a well-financed and well-oiled opponent.  *See, e.g.*, *U.S. v. Georgiou*, 777 F.3d 125, 144 (3d Cir. 2015) ("Under the doctrine of curative admissibility, i.e., 'opening the door,' when one party introduces inadmissible evidence, the opposing party may introduce otherwise inadmissible evidence to rebut or explain the prior evidence." (quotations and citation omitted)); *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, and Products Liab. Litig.*, 2:12-cv-07263, 2016 WL 4039267, at * 5 (E.D. Pa. July 27, 2016) (Stengel, J.) (otherwise inadmissible evidence allowed "if the [opposing party] 'open[s] the door'"); *VSI Holdings, Inc. v. SPX Corp.*,

03-cv-70225, 2005 WL 5980804, at *8 (E.D. Mich. Apr. 12, 2005) ("should SPX open the door on any financial issue relative to SPX's size and wealth, VSI may then respond appropriately.").

### C.    Additional Issues.

The 1995 AMA Report is not hearsay; it is like any of the many publications or learned treatises that JHU will itself seek to admit into evidence.  As an official publication from the AMA House of Delegates Proceedings held on June 18-22, 1995 at the 144th Annual Meeting, it is a self-authenticating document under FRE 902(5) & (6); reflects a present sense impression under FRE 803(1); can be used during expert cross-examination under FRE 803(10); and qualifies for the residual exception in FRE 807.

JHU says it was trivial to abandon its product patent claims the PTO rejected, and driven by cost reasons—even though JHU pursued them for three years after its method claims issued. The 1995 AMA Report's recognized distinction between product and surgical method claims; and the fact of the size and extent of JHU's licensing and research budgets (including from the government) and funding resources; are probative to whether JHU's story is credible.

JHU also argues that Alcon cannot discuss JHU's federal funding given the Bayh-Dole Act.  (D.I. 348 at 8).  First, JHU has never produced documents to establish it has complied with the Act to render it applicable to the '848 patent.  Second, even if it had, that undermines JHU's royalty theories, since that would mean the government has a "nonexclusive, nontransferable, irrevocable, paid-up license" that JHU's expert never considered.  *See* 35 U.S.C. §202(c)(4).

Lastly, JHU asserts that the Federal Circuit upholds jury verdicts for indirectly infringing surgical method claims.  (D.I. 348 at 6).  In the cases JHU previously cited, the opinion and/or the patent issued before Congress passed 35 U.S.C. § 287(c); or involved specific scenarios (*e.g.*, a pharmaceutical drug method, or use of a patented machine to perform the method) that falls outside § 287(c)(2)(A) immunity.  (*See* D.I. 211 at 30-33).  JHU's MIL #2 should be denied.

III.    **Response to JHU MIL #3:  Dr. Donald D'Amico Should Be Permitted To Testify About The Prior Art And Background Facts Disclosed In His Expert Report.**

Alcon requests the Court deny—again—JHU's motion to exclude testimony from Dr. D'Amico on the nature and scope of the prior art, which was already decided on this same testimony.  (D.I. 219 at 17-18; D.I. 294 at 23; D.I. 339).  Alcon has agreed that Dr. D'Amico will not opine on the ultimate conclusion of invalidity.  (D.I. 235 at 19).  That is all Magistrate Judge Fallon excluded:  "Dr. D'Amico's opinion on the ultimate invalidity issue at paragraph 106 of his expert report and his corresponding deposition testimony."  (D.I. 294 at 23).

A.    **Dr. D'Amico Can Opine Consistent With His Expert Report On '848 Patent/Prior Art Comparisons Relating To Reasonable Royalty Issues.**

Despite JHU's attempts then and now to exclude this testimony, Dr. D'Amico should be permitted to testify about the history of vitreoretinal surgery, the state of the art before the patent was filed and the prior art references which relate to those opinions, as disclosed in his report. His opinions are relevant to reasonable royalty; what the smallest salable patent practicing unit ("SSPPU")[9] is; the "utility and advantages of the patent property over the old modes or devices" the prior art used; and the value to be "credited to the invention as distinguished from non-patented elements…."  *Georgia-Pacific*, 318 F. Supp. at 1120 (royalty factors 9, 13).

On SSPPU, beyond JHU's cited paragraph 98, Dr. D'Amico discussed what if any "improvements the Asserted Claims purportedly made over *the prior art methods*" and instruments.  (Ex. 43, D'Amico Rep. ¶ 94 (emphasis added)).[10]  He offered these opinions not

_____

[9] *VirnetX v. Cisco Systems*, 767 F.3d 1308, 1326-27 (Fed. Cir. 2014) (patentees "must take care to seek only those damages attributable to the infringing features"; "damages associated with the smallest salable patent-practicing unit is … a step toward meeting the requirement of apportionment.  Where the smallest salable unit" contains "several non-infringing features with no relation to the patented feature … the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology").

[10] *See, e.g.*, Ex. 43, D'Amico Rep. ¶ 104 ("As I describe elsewhere in this Report, the '848 patent did not change the basics of how corrective procedures for the retina were implemented or performed."); *id.* ¶ 107 ("All of these instruments [vitreous cutters/aspirators, light sources,

for invalidity, but to opine (as Magistrate Judge Fallon found and permitted) "on the smallest salable unit for purposes of the infringement analysis." (D.I. 294 at 23).

JHU's exaggerations aside, he will not "provide undisclosed opinions about an undisclosed universe of prior art." (D.I. 348 at 11 n.6). Dr. D'Amico will testify about the history of vitreoretinal surgery and what was known and/or conventional in the prior art for instruments and methods—which JHU cannot and does not dispute Dr. D'Amico disclosed in his expert report. (*See* Ex. 43, D'Amico Rep. ¶ 4). His report describes this intended testimony, and gives citation support to prior art references. (*See, e.g.*, *id.* ¶¶ 24-42, 98, 104, 107). For example, he cites to the Machemer 1995 prior art reference to explain the state of the art of surgery prior to the issuance of the '848 patent, and what vitrectomy instruments were developed and why. (*Id.* ¶¶ 36-37). These opinions will help the jury decide what (if any) alleged advantages the '848 patent method has over old methods, or should be credited to the '848 patent versus non-patented elements for royalty purposes, even without an opinion on the ultimate issue of what amount is reasonable as a royalty (left to Alcon's damages expert Julie Davis) or invalidity. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (relevant expert "need not have an opinion on the ultimate question to be resolved by the trier of fact in order to satisfy this requirement" of being relevant evidence). Also, Dr. D'Amico's tutorial on vitreoretinal surgery and technology; and what was known or conventional in the prior art will help the lay jury make its determinations. *See* FED. R. EVID. 702 Advisory Committee Notes to the 2000 Amendments (noting the importance "for an expert to educate the factfinder about general principles" even if the expert does not apply them "to the specific facts of the case").

---

cannulas, infusion lines or cannulas, forceps, hand held instruments] were in existence before the patent was applied for in March 2000."); *see also id.* ¶¶ 33-41, 98, 186-88.

**B.     Dr. D'Amico's Disclosed Opinions Are Timely; Involve Royalty Issues For The Jury To Decide; Are Probative; And Are Not Redundant/Prejudicial.**

JHU's fear of having to question Dr. D'Amico "on undisclosed opinions" is unwarranted. (D.I. 348 at 11).  He is not going to analyze prior art references other than the references already disclosed in his expert report.  Thus, no Fed. R. Civ. P. 26(a)(2) violation exists.

JHU's complaint that Alcon has Dr. Chang to opine on invalidity (*id*.) ignores that the SSPPU/reasonable royalty/incremental value analysis is not synonymous with whether the '848 patent's "without pulling back the conjunctiva" entry method was non-obvious.  Dr. D'Amico's testimony also responds to JHU's *infringement* expert, Dr. Haller, who opined on "Vitreoretinal Surgery Before The '848 Patent," even though JHU has its invalidity expert, Dr. Awh.  (Ex. 41, Haller Rep. ¶¶ 36-41).  Parties can present "complementary" expert testimony.  *Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*, Civil No. 12-1369, 2017 WL 3140798, at *6 (W.D. Pa. July 25, 2017).[11]  But it *would* be unfair and prejudicial to let JHU's infringement expert testify about the history of vitreoretinal surgery, and prevent Dr. D'Amico from responding, as JHU demands here.  Both sides can be instructed to avoid unnecessary duplication and cumulative evidence if need be.  Thus, JHU's MIL #3 should be denied.

**IV.     Response to JHU MIL #4:  Alcon Can Show That The Asserted Claims Cover Only Certain Product Uses, Not The Products Themselves Or All Product Uses.**

JHU seeks to preclude Alcon's evidence and argument that the claims cover only certain *methods* and not *products* (D.I. 348), particularly the prosecution histories of the '848 patent and its related divisional application, which show that JHU tried but failed to patent surgical devices; and that the PTO concluded the method claims and product claims were directed to "distinct" inventions.  (D.I. 358 Ex. 5, '848 patent PH at DTX2–193-94).

---

[11] Even if some cumulative testimony occurs, this is a timed trial.  *See St. Clair Intellectual Prop. Consultants, Inc. v. Acer, Inc.*, 935 F. Supp. 2d 779, 781 (D. Del. 2013) ("St. Clair's objection that Mr. Martinez's testimony is somewhat duplicative of Mr. Jarosz is not a basis for excluding his testimony since the trial will be timed and the parties will not be given time to waste.").

A.     JHU Again Misstates The Relevant Law And Facts.

JHU attacks a strawman, accusing Alcon of asserting it could never infringe a method claim.   (D.I. 348 at 13, 15).   *First*, Alcon secured summary judgment of no direct infringement of the method claim.   (D.I. 294 at 24-26; D.I. 339).   *Second*, as Section I(C) above explained, while JHU generally contends Alcon's liability is inducing and contributing to surgeon infringement, JHU's actual proofs (particularly at the damages phase) gloss over the "inducing and contributing" acts, to argue that mere *product sales with nothing more* constitutes Alcon's "infringing use" for 35 U.S.C. § 284 damages purposes.   That is not the law.

JHU asserts Alcon indirectly infringes by selling products Alcon "know[s] are used by surgeons to perform the claimed method."   (D.I. 348 at 14).   But "'knowledge of the acts alleged to constitute infringement' is not enough" to prove inducement.   *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) (quoting *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003)).   Inducement "must involve the taking of affirmative steps to bring about the desired result" above and beyond merely selling a product.   *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011).

JHU argues that Alcon contributes to infringement because the only "practical" use for Alcon's products is an infringing one.   (D.I. 348 at 14).   That is also not the standard.   *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1328 (Fed. Cir. 2012) ("That practicing the patented method may be the most logical or useful purpose for Appellees' products does not render the alternative uses" insubstantial.)   JHU must prove that Alcon's products have <u>no</u> "substantial non-infringing uses." *See, e.g.*, *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362-63 (Fed. Cir. 2012).   JHU insists Alcon's products "have no substantial use other than in performing the method" (D.I. 348 at 13); a fact dispute remains on this issue (*see* D.I. 294 at 31-35; D.I. 339), and Alcon should prevail because JHU's infringement expert

*admitted* Alcon's products are used in non-infringing ways (Ex. 39, Haller Tr. 131:16-135:15, 149:14-25 (discussing vit-buckle procedures); D.I. 294 at 31 ("The parties do not dispute that the vit-buckle procedure may constitute a non-infringing use of the Accused Products ….")).

Given its looming proof problems, JHU offers another new theory, found nowhere in its Final Infringement Contentions, expert reports, or the contemporaneous record:  that it believed its claims effectively cover all products because the method claims will "necessarily" be "indirectly infringed" by product sales.   (D.I. 348 at 14).  Even assuming JHU could raise this theory, that would increase, not negate, the relevance and importance of JHU's efforts to try and fail to secure instrument and kit patent claims; and creates new invalidity grounds for Alcon under 35 U.S.C. § 102.[12]  If JHU's purported devices "necessarily" can be put to use only in the claimed method, and the PTO concluded the prior art already disclosed those devices, that would help jurors conclude that the method itself was inherent in the prior art devices; but if not, and surgeons can put these same devices to use in *different* methods, then they necessarily possess non-infringing uses precluding contributory infringement.

Thus, important to the jury's understanding of what the claims do cover is to understand what they do not cover.  This gets to the core of disputed non-infringement issues.

**B.      The "Use Made Of The Invention" By The Accused Infringer.**

35 U.S.C. § 284 imposes a reasonable royalty "for the use made of the invention by the infringer."  Alcon does not "use" the method.  A product sale alone is not "use" of the method.  (*See* Section I, above, responding to JHU's MIL #1).  JHU did not assign a royalty to the alleged

---

[12] A method patent is invalid over prior art products when method steps are inherent in the prior product's use.  *See In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986); *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375-80 (Fed. Cir. 2005) (method claims to treating damaged skin (but not sunburned skin) were inherently invalid when old composition was applied to skin).

"indirect" infringing acts.  JHU's expert, Mr. Napper, focused only on product sales.[13]  JHU

chose to tie the "use" of the invention to products JHU never patented.  That causes JHU to run

afoul of the fundamental principle that infringement damages "must reflect the value attributable

to the infringing features of the product, and no more."  *Ericsson, Inc. v. D–Link Sys., Inc.*, 773

F.3d 1201, 1226 (Fed. Cir. 2014).  Patentees must "in every case" "separate or apportion" the

"damages between the patented feature and the unpatented features." *VirnetX*, 767 F.3d at 1326

(quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  Evidence that JHU failed to secure

claims for instruments makes it more likely than not, and is highly probative evidence, that at

least some portion of Alcon's  instruments are attributable to *unpatented* features the '848 patent

doesn't cover.  If JHU thinks this might be hard for jurors to figure out (it isn't), it is a problem

JHU created by insisting that its method patent deserved a product sales royalty.  Alcon is trying

to *undo* the prejudice to Alcon of JHU's product royalty theory, which necessitated Alcon's MIL

#1 to preclude JHU from misleading the jury.  (D.I. 349).

### C.     JHU's Mr. Napper Paints A Misleading Picture Of JHU's Patent Claims; Alcon Needs JHU's Abandoned Patent Application To Correct This.

JHU's damages expert, Mr. Napper, assumes the asserted claims cover instruments and

methods.  His reasonable royalty opinions incorrectly assume the asserted claims *directly* cover

both methods and products.[14]  That the PTO refused to give JHU a surgical instrument or kit

patent directly rebuts his core assumption, and thus is a ripe topic for cross-examination.

Mr. Napper's faulty assumption cascaded through his application of the factors from

---

[13] *See* Ex. 38, Am. Napper Rep. at 63-64 (Alcon's product sales "indicates Alcon's extensive use
of the technology ***assumed to be covered by the asserted '848 Patent****.*… I consider this factor to
have an upward impact on my analysis of a reasonable royalty for the asserted '848 Patent.).

[14] *See, e.g.*, Ex. 38, Am. Napper Rep. at 18 ("the '848 Patent describes and claims a method ***and***
associated instruments"; "the patent covers a method ***and*** instruments for performing surgery"),
19 ("the patented surgical technique ***and*** instruments"), 100 ("Both standalone instruments and
standard vitreoretinal packs are ***directly*** accused of infringement …") (emphasis added).

*Georgia-Pacific*, 318 F. Supp. at 1120, *e.g.*, "[t]he nature of the patented invention" and "[t]he portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements," *id.*, in his reasonable royalty analysis.  He heavily emphasizes the value of small-gauge instrumentation, *e.g.*, 25-gauge instruments.  (Ex. 38, Am. Napper Rep. at 59-60 (discussing dominance of 25 gauge instruments), 71-72 (same)).  He spills a lot of ink arguing that the need for "research and development ***of the product*** and in establishing the market for the small-gauge ***products***" reflected a high-risk venture deserving of a higher royalty rate.  (*Id*. at 73-80 (emphasis added)).  That JHU tried and failed to patent 25-gauge instruments and kits in its abandoned patent application—and that the PTO recognized the distinction between the products and the claimed method—shows Mr. Napper's opinions deserve no weight; his assumptions improperly inflate JHU's royalty demand; and that surgical devices themselves are "non-patented elements" as to JHU.  *Prohibiting* the jury from learning that JHU tried and failed to secure claims to surgical instruments and kits—as opposed to being transparent about what JHU could secure—would confuse and mislead the jury by obscuring what JHU actually claimed; what the PTO permitted; and why Alcon's products are non-patented as to JHU.

JHU argues that "it is typical and permissible to calculate a reasonable royalty for infringement of method claims by using the price of products used to perform the method."  (D.I. 348 at 15-16).  First, in the cases JHU cites, *product* claims were asserted.  *See Warsaw*, 778 F.3d at 1370-71, 1377-78 (discussing a reasonable royalty for infringement of, *inter alia*, product claims of the '973 and '933 patents); *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1552-53, 1556 (Fed. Cir. 1997) (patentee was a manufacturer asserting product claims, and the product sold (a computer) *itself* performed the accused method).  In *i4i Limited Partnership v. Microsoft Corp.*, Microsoft waived its right to challenge the sufficiency of the evidence for the jury's

16

damage award; the Federal Circuit found sufficient evidence to support Microsoft's direct, induced, *and* contributory infringement.  598 F.3d 831, 855, 857 (Fed. Cir. 2010).  Yet even there, the damages assessment surveyed product purchasers to determine the number who used the product in an infringing way—JHU never did so here.  *Id*. at 855-56.  Even assuming some infringement occurs, because JHU lacks a product claim, it is not entitled to a reasonable royalty on all product sales.  *See, e.g.*, *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1358-59 (Fed. Cir. 2009) (unlike with a product claim, "Cardiac can only receive [damages for infringement of a method claim] on those devices that actually performed the patented method").

JHU seeks to silence Alcon on the nature of the asserted claims in an attempt "to convert its method claims into apparatus claims" by blurring the line between the two types of claims.  *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775-76 (Fed. Cir. 1993).  The Federal Circuit "has long warned that … the distinction [between apparatus and method claims] should not be 'blurred.'"  *Nassau Precision Casting Co. v. Acushnet Co.*, 566 F. App'x 933, 940 n.1 (Fed. Cir. 2014) (citation omitted)).  Alcon must be permitted to rebut JHU's misleading attempts to pass off its method claims as product claims.  Alcon's evidence and arguments regarding the nature of the asserted claims therefore are relevant and admissible.

### D.   Alcon's Evidence Avoids Unfair Prejudice, Confusion, And Counters JHU's Efforts To Mislead The Jury When Telling Its Story Of The Invention.

JHU concludes, but does not articulate *why*, any aspect of its failed attempts to patent surgical devices is unfairly prejudicial, confusing, misleading, or a waste of time.  (D.I. 348 at 13, 16).  JHU is calling not just Dr. de Juan, but a named inventor whose primary responsibility involved making instruments to tell a story about *product* development and describe instrument pictures in the '848 patent.  It would be unfair to Alcon and mislead the jury if Alcon cannot respond that whatever the inventors thought they invented in the specification, the PTO refused

to give them product claims.  Left uncorrected, it is entirely plausible to expect the jury would assume that the claims involve the products.  JHU wants the jury to only hear half of the story.

### E.      Independent Admissibility.

The divisional application's prosecution history is independently admissible under FRE 106:  if "a party introduces all or part of a writing … an adverse party may require the introduction [of] … *any other writing* … that in fairness ought to be considered at the same time."  FED. R. EVID. 106 (emphasis added); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988) ("[T]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." (citation omitted)).  Admitting only the '848 patent's prosecution history (which includes instrument and kit claims as part of the "invention"), but not the divisional application finally disposing of those claims, will avoid "unfair distortion or creation of misunderstanding."  *Bland v. PNC Bank, N.A.*, 15cv1042, 2016 WL 10536026, at *6 (W.D. Pa. Dec. 30, 2016).   JHU's MIL #4 should be denied.

## V.      Response to JHU MIL #5: Alcon Can Present Relevant, Probative Evidence Concerning Whether Non-Infringing Uses Are Substantial.

Evidence that non-infringing uses, *e.g.*, vit-buckles, are important to surgeons and patients is relevant, and not confusing or prejudicial to JHU at all.  Whether a given use is medically important gets to the essential question of whether such a use is "substantial."

### A.      The Importance Of Non-Infringing Uses Is Relevant To Whether Such Uses Are "Substantial."

JHU must prove an absence of substantial non-infringing uses for Alcon's products.  (D.I. 294 at 30).  JHU misstates the standard by suggesting Alcon infringes merely because surgeons could or frequently use Alcon's products to infringe.  (D.I. 348 at 17-18); *see* Section I(C),

above.[15]   A "substantial" non-infringing use is not "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental."  (D.I. 210 at 8 (quoting *i4i*, 598 F.3d at 851); *see* D.I. 348 at 18).   While JHU believes frequency trumps all, in reality JHU must show, *e.g.*, that the vit-buckle procedure fails to satisfy *any* of these categories.   A use important to surgeons is relevant evidence showing the use is not far-fetched; illusory; impractical; aberrant; or experimental. Surgeons can and do use Alcon instruments to perform non-infringing vit-buckle procedures, which improve vision.[16]   This renders the procedure a practical and not illusory use.   *Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC), 2017 WL 5054711, at *21 (E.D.N.Y. Nov. 2, 2017) (noting "benefits" when comparing the patented assembly with the asserted non-infringing uses).   The jury should hear such evidence.   *See Tyco Healthcare Grp. LP v. Biolitec, Inc.*, No. C-08-3129 MMC, 2010 WL 3324893, at *5 (N.D. Cal. Aug. 23, 2010) (dispute concerning the practicality of non-infringing use was for the trier of fact).

### B.   JHU Has Argued The Comparative Importance Of Surgical Methods.

The claims involve a method for entering the eye, using entry alignment devices, *without* pulling back the conjunctiva.  (D.I. 348 at 17; D.I. 294 at 31-32).   JHU argues "the Patented Technique is the industry standard for vitreoretinal surgery," (D.I. 13 ¶ 56; *see also id.* ¶ 55), and that because "its commercial introduction by Dr. de Juan and JHU's licensee" it "has quickly become the standard for performing vitreoretinal surgery."  (Ex. 46, JHU Final Contentions at

---

[15] A product falls beyond the scope of a staple article of commerce when it is "unsuited for any commercial noninfringing use" and has "no use except through practice of the patented method." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 441 (1984).   The accused products "need merely be capable of substantial noninfringing uses."   *Id.* at 442; *In re Bill of Lading*, 681 F.3d at 1338 (when products are "interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie").

[16] JHU's surgeon experts admit they perform vit-buckle procedures, including with small-gauge Alcon instruments.  (Ex. 39. Haller Tr. 131:19-132:1, 133:19-134:1, 148:24-149:21; *id.* 89:10-13; Ex. 44, May 2017 Awh Rep. ¶ 19).  Alcon's expert Dr. Ryan will testify that the procedure is a necessary to be a competent eye surgeon.  (Ex. 45, June 2017 Ryan Rep. ¶¶ 75-85).

13).   JHU thus placed the relative importance of surgical methods in play.   JHU argues that "[b]ecause ***vit-buckles afford little, if any, clinical advantage*** over vitrectomy alone and ***have substantial disadvantages*** for the patient, … ***the continued use of vit-buckles is controversial.***" (D.I. 210 at 11 (citing Ex. 47, Awh Supp. Rep. ¶¶ 19-25) (emphasis added)).   Having made these proclamations, Alcon can respond with evidence that non-infringing vit-buckle uses yield positive outcomes; are an important treatment option for certain patients (*e.g.*, patients with retinal detachments)[17]; and that its instruments are used interchangeably in this procedure.   *See In re Bill of Lading*, 681 F.3d at 1338; *U.S. v. Starnes*, 583 F.3d at 196, 215 (3d Cir. 2009) (relevant evidence "is excludable under Rule 403 if its probative value is substantially outweighed by the danger of *unfair* prejudice, not just prejudice.").   Alcon's evidence (and JHU's expert admissions) certainly will not help JHU's case; but that is not the exclusion standard.   *Goodman*, 293 F.3d at 670 (that evidence helps one side prove its case is not grounds for Rule 403 exclusion).   JHU's MIL #5 should be denied.

## VI.   Response to JHU MIL #6:  Alcon Can Present The PAT Survey Data To The Jury.

JHU seeks to permit PAT Survey results to a question/topic and answer choices, but exclude surgeons' actual responses in number or bar graph format.   Alcon's minor concession that the results do not reflect *non-responder* uses to a degree of statistical significance is not grounds to exclude the *responder* numbers.   JHU would create, rather than avoid, confusion.

### A.   The PAT Surveys' Numerical Results Can Help Make The Jury's Qualitative Assessment—Is A Vit-Buckle Use "Substantial"—More Or Less Likely.

JHU must prove that vit-buckle procedures *are not* substantial non-infringing uses. While JHU harps on frequency, a use does not become "substantial" by meeting a statistical threshold.   The legal test—is the use "not unusual, far-fetched, illusory, impractical, occasional,

_____

[17] This includes admissions from JHU's own expert, Dr. Haller, who performs vit-buckles because vit-buckles have ***advantages*** in various circumstances.  (Ex. 39, Haller Tr. 148:15-18).

aberrant, or experimental," *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)—is a *qualitative* one.  (*See* D.I. 294 at 20 (whether a use is substantial "does not require numerical precision")).  The FRE 402 relevancy bar is low, *Starnes*, 583 F.3d at 214, and even JHU admits the surveys have some relevance.  (D.I. 348 at 23; D.I. 294 at 14-17).

Magistrate Judge Fallon confirmed that the "stated purpose of the PAT Surveys is to 'provide[] a snapshot of retina practice patterns around the globe' by collecting multiyear data from practitioners showing how clinical preferences change over time."  (D.I. 294 at 14).  JHU's experts use them that way in their own published work.  (*Id*. at 14-15).  JHU does not dispute that those who responded to the PAT surveys were actually surveyed; or contend the surveyors incorrectly compiled their responses.  Thus, when survey-*responding* surgeons were asked about a patient presenting with certain symptoms, it is relevant what answers, and how many, of those respondents said they would use vit-buckle procedures.  For example, surgeons were asked:



(Ex. 48, 2015 PAT Survey at DTX819–57).  JHU would have Alcon tell the jury that 815 surgeons responded to this question, but hide how many of the respondents recommended vit-buckles, or which answer was comparatively most popular from among those responding:



(*Id.* (emphasis added)).   This redaction would need an instruction; and *encourage* jurors to speculate—to both sides' detriment (one might assume 100% vit-buckle use; another 0%).

Better is to follow what Magistrate Judge Fallon recommended: put the surveys in evidence.   JHU will argue 815 surgeon survey answers do not meaningfully reflect nationwide surgeon practice.   Alcon can respond these responses deserve more weight than JHU's evidence: its experts' anecdotal guesstimates of surgeon vit-buckle use.   (D.I. 235 at 7).[18]   The jurors can do what jurors are asked to do—use the most credible and useful evidence.

Magistrate Judge Fallon also confirmed other relevant uses for the PAT surveys beyond merely noting that "the ASRS … survey[s] the use of these procedures each year."   (D.I. 294 at 17).   She agreed the compiled "responses from retinal surgeons indicat[e] that non-infringing procedures such as the vit-buckle are still used by practitioners" (*id.* at 16-17),[19] and are "relevant to the question of whether vit-buckle procedures … amount to a substantial non-infringing use" (*id.* at 20).   Redacting the bar charts and percentages prohibits Dr. Ryan from showing the jurors the relevant surgeon respondents' vit-buckle use, preferences and trends.[20]

---

[18] *See* Ex. 39, Haller Tr. at 171:10-173:12, 178:1-23 (JHU expert Haller just used her ██████████ 178:24-180:17 (Haller spoke to ████████ ████████████████████████ 178:17-23 (Haller relied on no documents or data); Ex. 49, Awh. Tr. at 136:20-137:2, 137:22-138:12 (JHU expert Awh only has ████████████

[19] The PAT Surveys "answer the question of whether vit-buckles are being performed and their general importance to the retina community" (Ex. 50, Ryan Supp. Rep. ¶¶ 29, 34 ("show the preferences and trends"), ¶ 38 (when surgeons would recommend vit-buckles), ¶ 55 (evolving trends, current treatment options), ¶ 56 (use for particular patient types)).

[20] JHU focuses on Dr. Ryan only for the PAT Surveys.   Dr. D'Amico also points to the numbers and bar charts in the PAT Surveys to show, *e.g.*, that in 2014 most surgeon respondents believed cutter performance is the "most important" vitrectomy platform feature."   (*See* Ex. 43, D'Amico

### B.    JHU Is Not Prejudiced If Jurors See The Survey Respondents' Actual Answers.

FRE 403 requires excluding relevant evidence if its probative value is substantially outweighed by the danger of "*unfair* prejudice" that "clouds impartial scrutiny and reasoned evaluation of the facts" and "neutral application of principles of law to the facts as found." *Starnes*, 583 F.3d at 215 (quotations omitted)); *Goodman*, 293 F.3d at 670.

JHU speculates that if jurors have PAT Survey numbers, they will assume, *e.g.*, from the above slide, that the 815 survey respondent answers = how *all* doctors behave nationwide.  (D.I. 348 at 21).    Surveys that assess *respondents*' preferences and trends (qualitative) are not synonymous with surveys that predict how *non-respondents* behave (statistical quantitation).[21] No one will assert the *respondents*' survey percentage results *quantitatively* match non-responding surgeons' vit-buckle usage nationwide to any degree of statistical certainty, as JHU alleges.  (D.I. 348 at 21; D.I. 294 at 21).[22]  But they do show that in a given year, some number of *respondents* chose vit-buckles as their treatment choice for certain clinical situations, confirming that a *real-world number* of surgeons actually would choose vit-buckles to address *real-world* clinical situations.  (*See* Ex. 50, Ryan Supp. Rep. ¶ 24; D.I. 294 at 16-17).  The jury cannot understand this without the charts and percentages; will not know that in some clinical situations, respondents chose vit-buckles over other surgical options; or that in some situations, they were the least favorite option (a fact JHU will no doubt use against Alcon).  Dr. Ryan has consistently explained that the percent or number of *respondents* answering particular questions

---

Rep. ¶ 143).  JHU's motion should not be construed to extend to Dr. D'Amico's opinions.

[21] *See U.S. v. McCluskey*, 954 F. Supp. 2d 1224, 1266-67 (D. N.M. 2013) (recognizing distinction between statistical DNA calculations and qualitative DNA evaluations (*e.g.*, that DNA of a person of interest is "consistent with" a sample); probative value of qualitative assessments were not substantially outweighed by any prejudicial effect).

[22] Dr. Ryan <u>agreed</u> the PAT Surveys could not "draw a precise, quantitative conclusion as to the number of vit-buckles" performed in a given year (Ex. 50, Ryan Supp. Rep. ¶ 24; D.I. 235 at 9).

is a numerical fact supporting his opinion that vit-buckles are a substantial non-infringing use; and does not statistically predict *non-respondent* usages outside the survey.  JHU's complaint that the jury may "have to quantitate" vit-buckle usage rates is because ***JHU's experts*** insist that because buckles are not used frequently enough, they must be insubstantial.  (D.I. 348 at 22).

Again, Alcon is not using the PAT Surveys to proffer a statistically-significant prediction of what *all* surgeons across the entire U.S. do.  But, they instructively show that vit-buckles are substantial if the responding surgeons would recommend using the procedure to treat patients. There is no risk of confusion.   JHU's MIL #6 should be denied

## VII.   Response to JHU MIL #7:  Documents From Dr. Ryan's Retrospective Study Were Produced In Response JHU's Requests, Are Relevant, And Not Prejudicial.

JHU complains about documents produced after discovery closed relating to a retrospective study that Dr. Ryan initiated before, and unrelated to, this litigation; and did not complete collecting data for until after his deposition.  Thus, most documents JHU complains of did not exist as of the discovery cutoff date.  Dr. Ryan produced them to JHU.  Alcon offered to make Dr. Ryan available for an additional deposition.  JHU declined—choosing instead to cry foul in a transparent attempt to keep relevant evidence away from the jury rather than admit that the study confirms vit-buckles are a substantial non-infringing use of Alcon's products.[23]

### A.    Dr. Ryan's Study And The Disputed Documents.

The vit-buckle procedure is a non-infringing use; JHU only disputes whether it is used frequently enough to be "substantial."  (D.I. 294 at 31-32).  To support his opinions that the procedures *are* substantial, Dr. Ryan relied upon data from actual surgical procedures at five different hospitals; data from his own 9-surgeon practice; medical doctor surveys; published literature; and his 30 years of experience.  Dr. Ryan produced every document he relied upon for

---

[23] JHU's position is also considerably in contrast with its own expert, Mr. Napper; after the Final Pretrial Order was submitted, JHU submitted a "supplemental" expert report of Mr. Napper with new opinions; and refused to withdraw it.  (Ex. 51, 4-20-18 Thornburgh Email).

his expert opinions pursuant to Rule 26, and JHU has never argued otherwise. JHU instead has relentlessly sought to exclude this real-world evidence. (D.I. 219 at 8-17; D.I. 348 at 20-23).

The study seeks to fill a gap in the surgical literature: whether vit-buckle procedures produce better surgical outcomes, and if so, for which types of patients.[24] Unlike JHU's experts (who offer their unscientific, gut feelings about vit-buckle use), the study provides evidence-based guidance comparing outcomes from vit-buckle, vitrectomy, and scleral buckle procedures. (Ex. 45, June 2017 Ryan Rep. ¶ 11). Data collection did not close until after Dr. Ryan's deposition. Dr. Ryan has since then published his preliminary conclusions; produced those conclusions to JHU; and made himself available for JHU to take another (third) deposition.

### B.   Dr. Ryan Complied With Rule 26 And JHU's Shifting Demands.

After Dr. Ryan described his ongoing study in his June 6, 2017 expert report, JHU subpoenaed his data: "[c]oncerning each surgical treatment"; underlying an abstract his expert report relied upon; and "[c]oncerning the type of instrumentation."[25] (D.I. 359 Ex. 6, Ryan Subpoena at 3-4). Pre-deposition, Dr. Ryan produced what JHU requested: a spreadsheet including then-existing data from the study that addressed each of JHU's subpoena requests. (Ex. 52, 8-22-17 Production Emails). But then JHU demanded more updated data, unredacted versions of the previously produced data, the protocol, and documents explaining spreadsheet codes. (D.I. 359 Ex. 8, 9-11-17 Drakulich Email). To avoid repeat productions, with the data collection/entry ongoing, Dr. Ryan waited until all the data was entered; and then produced the spreadsheet on January 19, 2018, along with other documents later requested by JHU. (Ex. 53, 1-19-18 Production Email).

---

[24] As JHU's Dr. Haller admits, vit-buckle procedures do provide advantages for patients with clear PVR. (Ex. 39, Haller Tr. 144-145).

[25] JHU's subpoena also included the boilerplate "all documents concerning the retrospective study" language, but then specifically described these actual categories of documents.

JHU then asked for documents provided to third party medical societies. (D.I. 359 Ex. 8, 2-14-18 Drakulich Email). Neither JHU's subpoena nor its previous demands requested these documents. But Dr. Ryan complied anyway. (D.I. 359 Ex. 10, 2-23-18 Production Email). JHU moved the goal posts yet again, this time demanding correspondence with the surgeons participating in the study and medical societies expressing interest in it. (D.I. 359 Ex. 8, 3-21-18 Drakulich Email). Dr. Ryan drew the line on searching his confidential emails with other surgeons and professional societies about patient records—an unnecessary intrusion and well beyond Rule 26.

Dr. Ryan complied with JHU's subpoena. JHU cannot now construe it to inappropriately nullify Rule 26. *Westchester Surplus Lines Ins. Co. v. Interstate Underground Warehouse & Storage, Inc.*, No. 16-00136-CV-W-HFS, 2017 WL 2313288, at *2 (W.D. Mo. May 18, 2017) ("Rules 26 and 30 operate as a control, or brake … [on] runaway use of the subpoena *duces tecum* to compel the production of the evidence of experts retained by a party to testify at trial.").

### C.     There Is No Prejudice To JHU.

Alcon asked JHU to explain its purported prejudice months ago. (D.I. 359 Ex. 8, 1-24-18 Forbes Email). JHU declined. JHU now claims prejudice because it could have subpoenaed study centers for raw data. (D.I. 348 at 26). *First*, Dr. Ryan already produced the raw data (the study sites entered data from patient charts into the database from which the spreadsheet in question was pulled). *Second*, his report references the study centers. (Ex. 45, June 2017 Ryan Rep. ¶ 161). JHU could have sought subpoena contacts back then, and didn't. *Third*, JHU's assertion it would have subpoenaed "the organizations to which Dr. Ryan apparently submitted abstracts of his study" (D.I. 348 at 26) rings hollow when his report cited an abstract submitted to the American Academy of Ophthalmology; and JHU never subpoenaed the latter or the foundation holding the study data. (Ex. 45, June 2017 Ryan Rep. ¶ 161). *Fourth*, Dr. Ryan did

not rely upon such information; and discovery of them is irrelevant, medically sensitive, and an abuse of Rule 45.  **Fifth**, JHU deposed Dr. Ryan twice, and cancelled the third Alcon offered.[26]

Finally, Alcon proposed a fair compromise: Alcon would not affirmatively use the later-created and produced documents at trial, as long as JHU would not seek to use their absence against Alcon.  (D.I. 359 Ex. 8, 4-28-18 Polivick Email).  In essence, JHU cannot disparage Dr. Ryan for relying on the data set that existed at the time of his expert report for being "incomplete" or preliminary.  JHU refused.  Thus, JHU seeks to attack Dr. Ryan for citing an early database set, without permitting Dr. Ryan to respond that his opinions stand even if the full set is used.  JHU's Motion *in Limine* #7 should be denied.

## VIII.  Response to JHU MIL #8:  Alcon Should Be Permitted To Introduce Its Own Patents And Testimony Concerning Those Patents And The Accused Products.

JHU wants the jury to believe that the '848 patent alone drives Alcon's product sales. But JHU chose to delay disclosing the substance of its reasonable royalty theories until after fact discovery closed.  Once JHU disclosed its theories in Mr. Napper's expert report, he clearly failed to apportion any value to Alcon's patents, even though features these patents claim help drive Alcon's sales.  Alcon's patents are relevant evidence to rebut, *e.g.*, JHU's damages theories.

### A.    Procedural Background.

In 2015, Alcon's Interrogatory No. 7 asked for the factual bases for JHU's reasonable royalty demand.  (Ex. 54, JHU Resp. to 1st Set Interrogs. at 21).  JHU provided no substantive response, postponing its answer to when "JHU's identification of its damages model is due on

---

[26]  Dr. Ryan is an extremely busy surgeon with patients and partners who depend on his availability.  Alcon worked with Dr. Ryan to find time for a May 11, 2018 deposition (which Alcon agreed to schedule pursuant to JHU's demands that he address the disputed documents); confirmed the date with JHU; and then JHU cancelled it on May 8, 2018.  (D.I. 359 Ex. 8, 4-13-18 Drakulich Email; *id.*, 4-17-18 Drakulich Email; *id.*, 5-8-18 Drakulich Email).  JHU's behavior should not be rewarded by compelling yet another deposition.

November 30, 2015." (*Id.*)  That date passed; Alcon pressed JHU for a response.  On March 2,

2016, JHU stated it "will provide expert opinions on the issue of damages on the date provided in

the Court's Scheduling Order—April 27, 2017." (Ex. 55, JHU 2nd Supp. Resp. to 1st Set

Interrogs. at 25).  In the meantime, JHU provided a bare-bones document it called its "damages

model." (D.I. 52 Ex. 1 at 9-10).  Alcon moved to compel.  (D.I. 52 at 2-4).  In the end, JHU only

had to disclose that it would "seek at least a reasonable royalty not only on products used to

perform the claimed methods, but also on Alcon's sale of unpatented products that are

functionally related to the patented method and that are sold by Alcon because the claimed

method creates the basis for customer demand for those devices." (D.I. 67 at 21 (quoting D.I. 52

Ex. 1 at 9-10)).  JHU was well aware that Alcon *did* have multiple patents covering its accused

products; Alcon listed which patents involved which products on its website.[27]  Alcon provided

the latter list to comply with the marking requirements of 35 U.S.C. § 287(c).[28]  Alcon's product

kits (samples of which Alcon produced to JHU) list each patent that covers the contents.  JHU

deposed several inventors whose patents were assigned to Alcon and/or its corporate affiliates.

But JHU's representation it sought royalties on patented and unpatented products made it seem

the nature and scope of Alcon's patent coverage was irrelevant.

 Alcon had to wait until JHU's expert reports for the substance of JHU's damages theory.

After it became apparent that Alcon's own patents covering the accused products *would* be

relevant,[29] Alcon timely supplemented its interrogatory responses.  JHU never challenged the

---

[27] *See* Ex. 56 (list of patents covering, *e.g.*, Alcon's accused products and Constellation system; list produced as ALCONMIVS1028487-504); *see also* Ex. 57, (production of product samples containing patent numbers, produced in September 2016); Ex. 58, (production of 71 Alcon U.S. patents relating to Alcon's products, produced in July 2016 as ALCONMIVS0521803-522718).

[28] If these patents did not actually cover Alcon's products, Alcon would be liable for damages from both the federal government and competitors for false marking under 35 U.S.C. § 292.

[29] For example, JHU's expert Mr. Napper discussed various Alcon patent licenses for its products in his report from ████████████████████████

premise that Alcon's licenses and patents covered the products that the documents and product lists said were the patents that covered them until *Daubert* motions.  Even today, JHU refuses to identify a *single* patent that it contends Alcon has inaccurately represented in its 35 U.S.C. § 287(a) patent marking lists as covering its products.  Magistrate Judge Fallon thus properly rejected JHU's efforts to exclude Alcon's representations on which patents covered which products; JHU took no appeal from that decision.  (D.I. 294 at 24; D.I. 339).  JHU now attempts to get a second bite of the apple with respect to these patents.

> **B.     It Is Not Confusing Or Misleading To Admit Alcon's Patents Into Evidence; They Are Relevant Evidence Underlying Various Licenses, Alcon Product Descriptions, And Fact Witness Work; And Alcon's Experts Cite Them.**

JHU demands exclusion of Alcon's patents as irrelevant and likely to confuse the jury.  But JHU plainly plans to introduce at least some of these patents as its expert Dr. Awh opined upon Alcon patents and applications involving instrument features Dr. Ryan invented, including U.S. Patent Nos. 8,202,277 and 8,308,737, and U.S. Patent Application No. 10/767,556.  (Ex. 44, May 2017 Awh Rep. ¶ 39).  Dr. Awh compares and contrasts this technology with the method in the '848 patent, and even a B&L vitrectomy cutter.  (*Id.* ¶¶ 39-44).[30]  He *confirmed* Alcon's products *were* covered by Alcon patents.  JHU's Mr. Napper relied on Dr. Awh's analysis to opine he could disregard them in JHU's damages analysis.  Alcon's patents thus are ripe material to use on Mr. Napper's cross-examination; and thus need to be admitted.   JHU cannot have it

(Ex. 38, Am. Napper Rep. at 29-38).

For example, Dr. Awh admits the "stiffener sleeve technology" disclosed in these patents is incorporated into Alcon's accused 25+ and 27+ products.  (*Id.* ¶ 43).  Dr. Awh clearly states that he was asked to "compare the significance" of the technologies set forth in these Alcon patents "to the practice of vitreoretinal surgery to the transconjunctival method described and claimed by United States Patent No. 7,077,848."  (*Id.* ¶ 25).

both ways: use some Alcon patents to argue one part of its case, and then insist that Alcon be precluded from putting these and others into evidence in response.

Mr. Napper also invokes the entire market value rule ("EMVR") to justify his broad product royalty base. Alcon's expert, Julie Davis, explains why Alcon's patents involve features that independently drive sales, precluding use of the EMVR. (Ex. 59, Davis Rep. at 41-42, 59). Ms. Davis likewise criticized Mr. Napper for failing to account for features patented by Alcon in the context of the reasonable royalty rate. (*Id.* at 63).

Moreover, Dr. D'Amico included and cited to Alcon patents in his expert report, and JHU questioned him about them. (*E.g.*, Ex. 43, D'Amico Rep. ¶¶ 132, 140, 147, 155, 162, 177-78; Ex. 60, D'Amico Tr. 225:14-21). Magistrate Judge Fallon, ruling on JHU's *Daubert* Motion, agreed that Dr. D'Amico may testify about these patents. (D.I. 294 at 24). If JHU wishes to challenge the rigor of his review, it can do so on cross-examination.

JHU characterizes Mr. Copeland (who has not yet been deposed) as offering undisclosed expert opinions that will inherently require "legal and technical analysis." (D.I. 348 at 31). First, its complaints are premature. Second, Mr. Copeland, as a member of Alcon's in-house legal team, is well aware from his tenure of Alcon's patent practices and the accused products; and can affirm the accuracy of Alcon's patent listings if JHU is now permitted to newly contest the issue. That is not expert opinion. *Ward v. Branch Banking & Tr.*, C.A. No. ELH-13-1968, 2017 WL 2242659, at *2 (D. Md. May 22, 2017) ("mere explication of facts or particularized knowledge, acquired through a person's employment, does not convert that person's fact testimony into expert testimony"); *U.S. v. Chapman*, 209 F. App'x 253, 267 (4th Cir. 2006) (witness' particularized knowledge learned through their jobs did "not convert their lay testimony into impermissible expert testimony.").

Alcon's product patents also are evidence relevant to rebut JHU's charge that Alcon willfully infringed JHU's method claims. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, C.A. No. 09-290, 2012 WL 5416440, at *2 (W.D. Pa. Nov. 2, 2012) (denying motion *in limine* to exclude patents, noting their relevance to claims of willful infringement and the trial court's broad discretion in such matters to admit *all* relevant evidence); *Wonderland NurseryGoods Co. v. Thorley Indus., LLC*, C.A. No. 12-196, 2014 WL 241751, at *2-3 (W.D. Pa. Jan. 22, 2014) (same); *Finjan, Inc. v. Sophos, Inc.*, C.A. No. 14-cv-01197-WHO, 2016 WL 4560071, at *8 (N.D. Cal. Aug. 22, 2016) (same).

### C.    An Appropriate Jury Instruction Can Resolve JHU's Alleged Prejudice.

JHU alternatively asserts that introducing the patents into evidence will cause jurors to believe Alcon cannot infringe (D.I. 348 at 29-30). JHU's cited cases are inapposite. No argument was made tying the patents to *e.g.*, royalty disputes in *Oxbo Int'l Corp v. H&S Manufacturing Co.*, C.A. No. 15-cv-292-jdp, 2017 U.S. Dist. LEXIS 87649, at *16 (W.D. Wis. June 2, 2017); and excluding unrelated patents generated "no prejudice" in *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1572-73 (Fed. Cir. 1986).

Here, Alcon is prejudiced if it cannot cross-examine Dr. Awh and Mr. Napper on not just the Alcon patents Dr. Awh considered, but to all of Alcon's patents. Courts routinely permit a defendant to introduce its patents and patent portfolio to challenge patentees' reasonable royalty theories. *Carnegie Mellon*, 2012 WL 5416440, at *1-2 (denying motion *in limine* to exclude patents, recognizing their relevance to the issue of a reasonable royalty); *Wonderland*, 2014 WL 241751, at *2 (same). JHU's hypothetical confusion can be cured with an instruction that the presence of such patents is not itself proof of non-infringement. *Wonderland*, 2014 WL 241751, at *3 ("[A]ny confusion or prejudice that may result from the admission of [defendant's] granted patents in evidence can be cured by a limiting instruction."). JHU's MIL #8 should be denied.

31

## IX.    CONCLUSION.

For the reasons set forth above, Alcon requests that JHU's Motions *in Limine* be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/*

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
skraftschik@mnat.com

*Attorneys for Defendants Alcon Laboratories, Inc. and Alcon Research, Ltd.*

OF COUNSEL:

William A. Rakoczy
Paul J. Molino
Deanne M. Mazzochi
John D. Polivick
Jeffrey A. Marx
Rachel P. Waldron
Gregory A. Duff
Kevin P. Burke
Erin M. Forbes
Katie A. Boda
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 222-6300

May 29, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.  I further certify that I caused copies of the foregoing document to be served on June 5, 2018, upon the following in the manner indicated:

Douglas E. McCann, Esquire                                    *VIA ELECTRONIC MAIL*
Martina Tyreus Hufnal, Esquire
Thomas L. Halkowski, Esquire
Kelly Allenspach Del Dotto, Esquire
Fish & Richardson P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
*Attorneys for Plaintiff*

Frank E. Scherkenbach, Esquire                               *VIA ELECTRONIC MAIL*
Kenton W. Freeman, Esquire
Fish & Richardson P.C.
One Marina Park Drive
Boston, MA 02210
*Attorneys for Plaintiff*

Todd G. Miller, Esquire                                          *VIA ELECTRONIC MAIL*
John W. Thornburgh, Esquire
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
*Attorneys for Plaintiff*

Corrin N. Drakulich, Esquire                                  *VIA ELECTRONIC MAIL*
Christina Brown-Marshall, Esquire
Fish & Richardson P.C.
1180 Peachtree Street NE, 21st Floor
Atlanta, GA 30309
*Attorneys for Plaintiff*

/s/ *Stephen J. Kraftschik*
Stephen J. Kraftschik (#5623)