## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOHNS HOPKINS UNIVERSITY,    :
    :
      Plaintiff,    :
    :  CIVIL ACTION
    v.    :
    :
ALCON LABORATORIES INC.,    :
  et al.,    :  NO. 15-525
    :
      Defendants.

## M E M O R A N D U M

**STENGEL, J.**                                     **August 29, 2018**

Currently before me are the parties' motions in limine. By their nature, these motions help streamline the trial. However, in some cases, the context of trial is necessary to properly evaluate the admissibility of evidence. With that in mind, I would encourage the parties to assert objections at trial regarding motions I have denied, if and when doing so becomes appropriate.

### A.  Legal Standard

Motions in limine allow the court "to exclude anticipated prejudicial evidence before the evidence is actually offered." Luce v. United States, 469 U.S. 38, 41 n.2 (1984). "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the

trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation mark omitted).

### B. JHU Motions in Limine 1–9

#### 1. Granted as to direct infringement, denied as to reasonable royalties: "Defendants Should Be Precluded From Injecting An Element of 'Harm' Into Either Direct Infringement or Reasonable Royalty Damages"

JHU moves to preclude Alcon "from arguing or presenting evidence to suggest that 'harm' is an element of either direct infringement or reasonable royalty damages" because it is not an element for either. (Doc. No. 348, at 1.) JHU argues that such evidence would be irrelevant under Rule 402 and prejudicial and misleading under Rule 403.

##### a. Direct Infringement

The parties note that direct infringement (here, allegedly by the surgeons using Alcon's instruments) is an element of induced and contributory infringement, the claims at issue in this case. (Doc. No. 348, at 2; Doc. No. 375, at 3.) JHU provides the following example of Alcon's allegedly improper arguments regarding lack of harm to JHU. This is taken from Alcon's Statement of Issues of Fact, at Exhibit 3 of the parties' pretrial order, under the heading, "Induced Infringement."

> Whether Alcon's affirmative actions after June 23, 2009—as opposed to other factors—actually caused the surgeons to directly infringe each and every element of the '848 patent for each of the Accused Products; and *whether JHU has suffered any harm actionable by damages as a consequence of the alleged infringement by surgeons and/or Alcon*, and whether such alleged affirmative

2

> actions by Alcon has caused JHU any harm that is actionable by damages; is immune from suit because such activity was engaged in pursuant to research and development efforts, and thus falls within the scope of the "safe harbor" provisions of 35 U.S.C. § 271(e)(1), *see, e.g.*, *Lilly*, 496 U.S. 661 (affirming Federal Circuit that the safe harbor applies when seeking pre-marketing approval for a medical device); and/or whether such uses may support JHU's damages claim against Alcon in view of 35 U.S.C. § 287(c).

(Doc. No. 288-1, Ex. 3 at 4) (emphasis added).

JHU argues that "the direct infringement statute says nothing about harm." (Doc. No. 348, at 3) (citing 35 U.S.C. § 271(a)). The statute reads:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a).

Alcon responds that JHU opened the door to a discussion of "harm." Justifying this argument, Alcon points to a footnote in JHU's motion in limine, which states that "Alcon's willful infringement has harmed JHU" through lost licensing revenue. (Doc. No. 375, at 1 (citing Doc. No. 348, at 3 n.2).)

It appears to me that this footnote is merely an aside to JHU's argument. Harm is not relevant to a determination of direct infringement (an element of indirect infringement). Therefore, I will grant JHU's motion in limine and will preclude Alcon from offering arguments or evidence of harm to prove direct infringement. This ruling only relates to direct infringement—if evidence of harm, or lack thereof, is relevant in other contexts at trial, we will resolve any objections at that time.

### b. Reasonable Royalties

A party liable for infringement is responsible for the following damages:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with the interest and costs as fixed by the court.

35 U.S.C. § 284.

JHU argues that "reasonable royalty damages are calculated based on the *value of what was taken* by the infringer, not the *damage suffered* by the patentee." (Doc. No 348, at 4 (citing <u>AstraZeneca AB v. Apotex Corp.</u>, 782 F.3d 1324, 1334 (Fed. Cir. 2015); <u>Warsaw Orthopedic, Inc. v. NuVasive, Inc.</u>, 778 F.3d 1365, 1377 (Fed. Cir. 2015); <u>Aqua Shield v. Inter Pool Cover Team</u>, 774 F.3d 766, 770 (Fed. Cir. 2014)).)

Alcon responds that JHU has put harm at issue by virtue of its own reasonable royalties arguments that put Bausch and Lomb (B&L) at the hypothetical negotiating table. (Doc. No. 375, at 1–2.)

> JHU's reasonable royalty theory puts B&L at the hypothetical negotiating table, and argues JHU must compensate B&L for 1) converting B&L's exclusive license to a non-exclusive one before granting Alcon a license; and 2) the "direct negative financial impact (*i.e.*, harm) B&L's *product* sales suffer if JHU licensed Alcon. (*See* Ex. 38, Am. Napper Rep. at 21, 45).

(<u>Id.</u>)

Further, Alcon responds that as part of its defense to the contributory infringement claim, it should be permitted to "show that it committed no affirmative act designed to cause JHU any infringement harm." (<u>Id.</u> at 3–4.) This consideration is separate from the

reasonable royalties issue but nonetheless shows that harm may be relevant to certain aspects of this case.

Additionally, Alcon argues that "JHU's inability to find any activity beyond Alcon's mere product sales that has harmed it or B&L—let alone caused a surgeon to indirectly infringe—is relevant; and independently probative on the question of the reasonableness of JHU's royalty demands." (Id. at 4 (citing Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354, 1372–73 (Fed. Cir. 2006); Eidos Display, LLC v. Chi Mei Innolux Corp., No. 6:11-CV-002010JRG, 2018 WL 1156284, at *9–10 (E.D. Tx. Mar. 5, 2018)).)

Lastly, Alcon argues that JHU's actual harm, or lack thereof, is relevant to indirect and willful infringement theories that "turn on Alcon's actual, specific intent at the time of the alleged infringement." (Id.) "If Alcon never harmed JHU, it is entirely appropriate for a jury to expect that Alcon was not seeking to willfully target JHU by acting like a pirate." (Id. (citing Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923, 1932 (2016)).) Along the same lines, Alcon argues that harm factors into its equitable estoppel defense because "JHU's lack of harm is why JHU was perfectly content to lie in wait for over ten years (while Alcon invested hundreds of millions in R&D efforts for its vitreoretinal product portfolio) and delay filing suit." (Id.)

Given the above analysis, it would not be proper to exclude evidence of harm as it relates to reasonable royalty at this stage because it may be relevant to various considerations. JHU may object to such evidence at trial if and when it becomes appropriate.

2. **<u>Granted in part and denied in part:</u> "Defendants Should Be Precluded From Introducing Evidence or Arguments about the Morality or Ethics of Patenting Surgical Methods and of Patenting Government-Funded Research"**

JHU moves to preclude evidence and argument "(1) suggesting it is unethical to patent medical procedures, or (2) suggesting that it is improper or immoral for a non-profit teaching hospital that receives some government research funding to seek patent protection on its inventions." (Doc. No. 348, at 5.)

### a. Morality and Ethics

JHU moves to exclude the 1995 American Medical Association "Reports of Council on Ethical and Judicial Affairs" (AMA report). (Doc. No. 348, at 5; Doc. No. 359, Ex. 4.) The report includes a "statement that 'the Council believes that it is unethical for physicians to seek, secure or enforce patents on medical procedures.'" (Doc. No. 348, at 5.) JHU argues that such evidence should be precluded under Rules 402 and 403 and states that "[a] viewpoint on the ethics of surgical method patents expressed by an AMA subcommittee and which is contrary to United States patent law expressly allowing such claims is irrelevant to the issues that will be tried to the jury." (<u>Id.</u> at 6.)

Alcon responds that the AMA report should be permitted to rebut JHU's "supposed pure motives; surgeon praise; and adherence to its university mission." (Doc. No. 375, at 5.) It notes that after the 1995 AMA report, which was critical of surgical method patents, "Congress precluded patentees from enforcing such patents at least against surgeons." (<u>Id.</u> at 5 (citing 35 U.S.C. § 287(c)(1)).)

Alcon asserts that "[b]oth the law and the 1995 AMA Report confirm the anti-patent-enforcement culture by and amongst surgeons." (Id. at 5–6.) Therefore, it argues that it should be permitted to "ask JHU's physician experts whether they accept their peers' ethical standard [as voiced within the AMA report] . . . or whether their long-term friendships with Dr. de Juan . . . trump those concerns." (Id. at 6.)

However, Alcon ignores an important point. JHU is not a surgeon, and the law does not protect JHU from surgical method infringement claims. Therefore, Alcon's purported use of the AMA report essentially attacks the right-mindedness of the applicable law. With that, I will grant JHU's motion to exclude the 1995 AMA report, to the extent it is used to attack the philosophy and principle of patenting surgical methods (as permitted by law).

Alcon notes a second instance when it may wish to use the AMA report at trial.

Alcon expects Ms. Wyskiel will opine that JHU was harmed because it "can't maximize licensing revenue" and its partners expect to have patents to protect "the dollars that they put into developing and marketing *products*." (Ex. 42, Wyskiel Tr. 126:7-127:2 (emphasis added); Ex. 40, JHU Resp. to Interrog. 12 at 8-9). Alcon can rebut this with the 1995 AMA Report, which differentiates between instrument patents and surgical method patents; and states that the former, not the latter, requires significant capital investment.

(Id. at 7 (footnotes omitted).)

I will not preclude the AMA report from being used in this manner, to rebut a statement. To summarize my conclusion on this issue, Alcon is precluded from using the AMA report as it relates to the principles, ethics, and related considerations underlying whether surgical methods should be patented, but it may use the report for other purposes, such as rebutting a witness's factual statement.

### b. Government Funding

JHU seeks to exclude evidence and argument that JHU's research is government funded. As an example of how this issue may arise at trial, JHU notes the deposition of Christy Wyskiel, senior advisor to the university's president. (Doc. No. 348, at 5, 7.)

> At Ms. Wyskiel's deposition, Alcon established that some of JHU's research is government funded, and that JHU patents some inventions developed through its research. (Ex. 3 at 14:6-23.) Counsel then asked "[w]ouldn't it be better for society if you just allowed anyone to practice the results of JHU's research instead of seeking a patent to exclude others from practicing it?" (*Id.* at 14:24-15:2.) While that may be an interesting topic for a philosophical or political discussion, it has nothing to do with the issues the jury will be asked to decide. . . . There is no authority for the proposition that, because the government provides funding to JHU, Alcon is immunized from liability for its willful infringement of JHU's patent.

(Id. at 8.)

Alcon responds that evidence of JHU's funding is relevant to damages in this case because JHU "seeks to boost its royalty by approximately $50 million based in part on the premise that it is a not-for-profit institution, Alcon did not help fund JHU's research, and B&L would be given a far lower royalty rate given the value of its early stage funding support of JHU's MADLAB (about $1.5 million total over several years)." (Doc. No. 375, at 7–8.) These potential arguments by JHU, Alcon argues, make it relevant that "JHU receives over $1 billion in research funding annually (including federal funds) . . . dwarfing the contribution B&L made years ago." (Id. at 8.) JHU argues that this evidence of government funding undermines JHU's "poverty pleas." (Id. at 8.)

In their arguments on this motion, the parties address at least two distinct purposes of evidence of federal funding. To the extent that evidence of federal funding addresses a

"philosophical or political discussion" of whether surgical methods should be patented, it is not permitted. However, at this time, I will not exclude such evidence as it relates to damages.

### 3. <u>Denied</u>: "Defendants Retained Expert, Dr. Donald D'Amico, Should Be Precluded From Testifying about the Prior Art Beyond the Disclosure of Paragraph 98 of His Report"

JHU moves to limit Dr. Donald D'Amico's expert testimony regarding prior art "to the discussion of the two references found in paragraph 98 of his report." (Doc. No. 348, at 12.) Paragraph 98 reads as follows:

> This claim covers a method for providing access within an eye using an entry alignment device without pulling back the conjunctiva. This fairly describes the invention as described in the specification, prosecution history, and as distinguished from the prior art methods. Entry alignment devices (e.g., cannulas) were known to provide access within an eye (see, e.g., Machemer 1985), and procedures that did not require pulling back the conjunctiva were known (see, e.g., '363 patent). However, I am not aware of an explicit description of providing access within an eye using an entry alignment device without pulling back the conjunctiva. Therefore, Claim 38 appears to address the differences between the explicit disclosures in the prior art and the claimed method.

(Doc. No. 224, Ex. 24 ¶ 98.)

JHU argues that limiting Dr. D'Amico's prior art testimony to the confines of this paragraph is appropriate because he is a "vitreoretinal surgeon" retained by Alcon to opine on "infringement and aspects of damages . . . [including] opinions about the smallest saleable patent practicing unit ('SSPPU')." (Doc. No. 348, at 9.) Whereas, Alcon retained a different expert, Dr. Stanley Chang, to opine on invalidity. (<u>Id.</u>)

JHU also seeks to exclude the information stated in paragraph 106[1] of Dr.

D'Amico's report. Importantly, as JHU points out, Judge Fallon's Report &

Recommendation (Doc. No. 294), which I adopted in its entirety (Doc. No. 339),

explicitly excludes paragraph 106. (Doc. No. 294, at 23.) Judge Fallon's opinion stated:

"The court's recommendation therefore excludes Dr. D'Amico's opinion on the ultimate

invalidity issue at paragraph 106 of his expert report and his corresponding deposition

testimony, but does not extend to Dr. D'Amico's opinion on the smallest salable unit for

purposes of the infringement analysis." (Id.)

In this motion, JHU seemingly seeks to both confirm Judge Fallon's ruling

regarding paragraph 106 and to narrow the terms of that ruling, by limiting it to

paragraph 98. In JHU's own words, it requests that I interpret Judge Fallon's ruling to

mean that Dr. D'Amico cannot "stray beyond the discussion found in paragraph 98 of his

report, block-quoted above, which is a subset of Dr. D'Amico's infringement analysis

and has nothing to do with validity." (Doc. No. 348, at 10.) JHU argues that if Dr.

D'Amico offered testimony regarding prior art beyond the scope of paragraph 98, "[s]uch

testimony would go beyond the scope of Dr. D'Amico's expert report in violation of Fed.

R. Civ. P. 26(a)(2), be unhelpful to the trier of fact under FRE 702 because the testimony

would be divorced from the relevant law of invalidity, irrelevant under FRE 402 for the

---

[1] Paragraph 106 reads as follows:

> It is also my understanding that Alcon has taken the position that the surgical methods
> disclosed in the '848 patent were disclosed in the prior art. More specifically, Alcon has
> taken the position that the claimed method of allowing access within an eye using entry
> alignment devices was disclosed by Dr. Machemer in his 1985 publication, (Machemer
> 1985), and that the claimed transconjunctival, sutureless, small gauge method was
> disclosed by Dr. Robert Josephberg in his '363 patent, ('363 patent). I agree with this
> position.

(Doc. No. 224, Ex. 24 ¶ 106.)

same reason, and excludable under FRE 403 because any probative value would be substantially outweighed by the danger of unfair prejudice to JHU." (Id. at 11.)

Alcon confirms that "Dr. D'Amico will not opine on the ultimate conclusion of invalidity." (Doc. No. 375, at 10.) However, Alcon argues that "Dr. D'Amico should be permitted to testify about the history of vitreoretinal surgery, the state of the art before the patent was filed and the prior art references which relate to those opinions, as disclosed in his report." (Id.) These opinions, Alcon argues, relate to reasonable royalty, because they shed light on the smallest salable patent practicing unit, the advantages of the patented property over old methods, and the value of the patented invention over nonpatented alternatives. (Id. (citing Georgia Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing reasonable royalty factors)).)

While Alcon acknowledges that Dr. D'Amico cannot testify outside the bounds set forth by Judge Fallon, it points out that Dr. D'Amico's relevant testimony goes beyond paragraph 98. Alcon cites paragraph 94 of Dr. D'Amico's expert report as an example:

> I have been asked to determine what I understand is called the "smallest saleable patent-practicing unit," which I understand is the product(s) sold by Alcon that embodies the "patented feature" of the Asserted Claims (I understand that no device is technically claimed by the '848 patent—only methods). To do this, I considered the language and scope of the Asserted Claims, the specification, the prosecution history, the improvements the Asserted Claims purportedly made over the prior art methods, among other things. The smallest saleable patent-practicing units, which embody the patented feature of allowing access within an eye without pulling back the conjunctiva and without using sutures to seal the wound, are Alcon's cannula system.

(Doc. No. 224, Ex. 24 ¶ 94.)

I will deny JHU's motion in limine to limit Dr. D'Amico's prior art testimony to paragraph 98 of his expert report. In general, I would hesitate to define restricted testimony by a paragraph number rather than a category of subject matter. And furthermore, I find that the Judge Fallon's report sufficiently resolves this issue. Judge Fallon very clearly stated that Dr. D'Amico may not testify regarding the "ultimate conclusion of invalidity" but may testify regarding "the smallest salable unit for purposes of the infringement analysis." (Doc. No. 294, at 23.) Beyond that, objections should be made at trial.

4. **Denied: "Defendants Should Be Precluded From Presenting Evidence or Argument that JHU's Election to Pursue Method Claims During Prosecution Prevents JHU From Recovering a Reasonable Royalty"**

In this motion, JHU seems to make two distinct requests for exclusion—one general and one specific. In its general request, JHU argues that Alcon should be precluded from offering evidence or arguing that "because JHU's patent claims are directed to methods of use, JHU cannot recover a reasonable royalty for Alcon's indirect infringement." (Doc. No. 348, at 13.) In other words, JHU argues that I should "preclude Alcon from contending that it cannot infringe method claims because that argument is legally wrong and will mislead the jury." (Id.)

As both parties acknowledge, this issue has already been addressed by Judge Fallon in her report. Judge Fallon found that Alcon did not *directly* infringe but found that "[i]t is well-established that medical device and drug manufacturers may be liable for inducing or contributing to a medical practitioner's direct infringement of a patented method." (Doc. No. 294, at 24–26, 28.)

On this point, I have nothing further to add. Judge Fallon thoroughly articulated the claims that remain at issue in this case and the law relevant to her analysis, and the parties must proceed accordingly.

Moving on to JHU's more specific request, JHU moves under Rules 402 and 403 to prohibit Alcon from making arguments and introducing evidence related to a patent application that JHU pursued separately from the '848 patent. (Doc. No. 348, at 14, 16.) JHU filed this separate patent application, which JHU refers to as the "Divisional Application," to cover surgical *tools*, but it later "discontinued prosecution" of the application. (Id.)

Alcon argues that evidence of the Divisional Application is relevant and would help the jury apportion damages because JHU's expert measures damages by product sales (*i.e.*, sales of surgical tools)—and JHU never obtained a patent on tools. (Doc. No. 375, at 14–15.) "Evidence that JHU failed to secure claims for instruments makes it more likely than not, and is highly probative evidence, that at least some portion of Alcon's instruments are attributable to *unpatented* features the '848 patent doesn't cover." (Id. at 15.)

Further, Alcon argues that evidence of the Divisional Application may be relevant on cross-examination of JHU's damages expert, Brian Napper, if he incorrectly asserts that the claims at issue "*directly* cover both methods and products." (Id. at 15.) Evidence of the Divisional Application "directly rebuts his core assumption, and thus is a ripe topic for cross-examination." (Id.) Further, JHU argues, "[e]ven assuming some infringement occurs, because JHU lacks a product claim, it is not entitled to a reasonable royalty on all

product sales." (Id. at 17 (citing Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 576 F.3d 1348, 1358–59 (Fed. Cir. 2009)).)

Given the above discussion, I agree with Alcon that the Divisional Application may be relevant to the discussion of damages and helpful to a jury, and I will accordingly deny this motion in limine.

### 5. **Denied:** **"Defendants Should Be Precluded From Making Any Arguments About the Importance of Alleged Substantial Non-Infringing Uses"**

JHU seeks to preclude Alcon "from making arguments or eliciting testimony about the 'importance' of alleged non-infringing uses of the accused products," under Rules 402 and 403. (Doc. No. 348, at 17.)

Pursuant to 35 U.S.C. § 271(c), which establishes liability for contributory infringement, JHU must show that Alcon's accused surgical tools are "not a staple article or commodity of commerce suitable for substantial noninfringing use." In this motion in limine, JHU argues that the "importance" of a surgical tool's use is irrelevant to, and could easily be confused with, the legal standard—"*substantial* noninfringing use." (Doc. No. 348, at 17–19.)

Specifically, JHU takes issue with Alcon's characterization of "vit-buckle" eye surgery, which Alcon argues is a "substantial noninfringing use." JHU argues:

> During fact and expert discovery, JHU adduced evidence that the accused products are used nearly exclusively to perform the patented method. Alcon has attempted to rebut that evidence by showing that the accused products have a non-infringing use—an eye surgery referred to as a "vit-buckle." Alcon's retained expert opined that, because vit-buckle procedures are "***important***" when used to treat retinal detachment patients, that use is a substantial non-infringing use (D.I. 224 at Ex. 20, Aug. 22, 2017 Ryan Rpt. ¶ 71.)

14

(Doc. No. 348, at 17–18.)

In JHU's argument that the surgery's "importance" is irrelevant, JHU seems to define importance as the surgery's impact on an individual patient. Importantly, in her summary judgment opinion, Judge Fallon defined "substantial noninfringing use" as

> any use that is "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). Relevant considerations in assessing whether an asserted non-infringing use is substantial include the frequency of the non-infringing use, its practicality, the invention's intended purpose, and the intended market. *See i4i Ltd. P'ship*, 598 F.3d at 851.

(Doc. No. 294, at 31.)

Alcon responds that a "use important to surgeons is relevant evidence showing the use is not far-fetched; illusory; impractical; aberrant or experimental." (Doc. No. 375, at 18.) I agree with Alcon; JHU is mincing words here. The word "important," detached from justification and context, is fairly meaningless, and the substance behind the word "important" is almost certainly relevant to a "substantial noninfringing use" analysis.

A jury is wise enough to make the necessary distinctions. And witnesses at trial should not have to carefully dance around a word, "important," throughout their testimony, unless absolutely necessary. In general, I hesitate to limit testimony or evidence by terminology rather than substance. Therefore, I will deny this motion.

### 6. <u>Denied:</u> "Defendants Should Be Precluded from Presenting the Quantitative Data in the PAT Surveys to the Jury"

At the summary judgment stage, JHU moved to exclude the Preferences and Trends Surveys (PAT Surveys) in their entirety. Judge Fallon denied that request. (Doc.

No . 294, at 14–21.) Now, in this motion in limine, JHU moves to exclude the

"quantitative data" contained within those surveys. (Doc. No. 348, at 20.) The following

summary from Judge Fallon's report provides necessary context on this issue:

> Alcon's expert, Dr. Edwin Ryan, relies in part on Preferences and Trends
> Surveys ("PAT Surveys") to support Alcon's position that there are substantial
> non-infringing uses of the Accused Products, including their use in vit-buckle
> procedures, procedures involving suturing, and procedures that are not corrective
> procedures for the retina. (D.I. 224, Ex. 18 at ¶¶ 191-214) Since 1999, a
> professional society of over 3,000 retinal specialists known as the American
> Society of Retina Specialists ("ASRS") has annually surveyed its members on a
> range of surgical topics to collect the data compiled in the PAT Surveys. (D.I. 236,
> Ex. 17; D.I. 224, Ex. 18 at ¶ 88) Members of the ASRS must be Board-certified
> surgeons or fellows, and ASRS members include JHU's experts, Dr. Carl C. Awh
> and Dr. Julia A. Haller, as well as named inventor Dr. Eugene de Juan, Jr. (D.I.
> 236, Ex. 19 at 1; Ex. 20 at ALCONMIVS1025618; Ex. 21 at
> ALCONMIVS1025107; Ex. 22 at 13; 11/15/17 Tr. at 29:13-30:5)
> The stated purpose of the PAT Surveys is to "provide[] a snapshot of retina
> practice patterns around the globe" by collecting multiyear data from practitioners
> showing how clinical preferences change over time. (D.I. 220, Ex. 7 at
> ALCONMIVS1025796) ASRS publishes the results of the PAT Surveys annually
> on the ASRS member website and at ASRS meetings, as well as in the *Retina
> Times* publication. (D.I. 220, Exs. 1-8' D.I. 224, Ex. 18 at ¶ 88; D.I. 236, Ex. 18)
> Retinal surgeons, including Dr. Awh and Dr. Haller, rely on the PAT Surveys as
> evidence of practice trends in the field. (11/15/17 Tr. at 30:19-31:2) . . .
> However, the PAT Survey guidelines provide that "[a]ll responses are
> retrospective opinion and are not based on accurate review of records by the
> respondents. There is no implication of any 'correct' or 'incorrect' responses, nor
> is there any establishment of 'clinical standard of care.'" (D.I. 220, Ex. 7 at
> ALCONMIVS1025793) The record reflects that only one out of every three ASRS
> members participated in the 2015 PAT Survey, which represented a record number
> of responses. (D.I. 220, Ex. 7 at ALCONMIVS1025798) Although the PAT
> Surveys present data regarding non-infringing uses, the data does not account for
> the low response rate and is not weighted for the number of surgeries performed
> by each respondent. (D.I. 220, Ex. 7 at ALCONMIVS1025851)

(Doc. No. 294, at 14.)

Here, JHU requests exclusion of the "percentages and bar graphs" that tally the

doctors' responses in the PAT Surveys. (Doc. No. 348, at 20–21.) JHU argues that this

data would be "misleading and confusing" to jurors, who "would incorrectly assume the numbers may be considered in their quantitative assessment of the frequency with which vit-buckle procedures are performed across the country." (<u>Id.</u> at 21.) JHU summarizes its position: "[T]he PAT Surveys are relevant to show that surgeons are still asked questions about the vit-buckle procedure, but the surveys are not relevant or reliable indicators of how often those procedures are in fact performed." (<u>Id.</u> at 23.)

Alcon responds that the surveys accurately reflect the responses of the surgeons who participated—and that the quantitative data is relevant to that end. (Doc. No. 375, at 21.) "No one will assert that the *respondents'* survey percentage results *quantitatively* match non-responding surgeons' vit-buckle usage nationwide to any degree of statistical certainty, as JHU alleges." (<u>Id.</u> at 23.) "But they do show that in a given year, some number of *respondents* chose vit-buckles as their treatment choice for certain clinical situations, confirming that a *real-world number* of surgeons actually would choose vit-buckles to address *real-world* clinical situations." (<u>Id.</u>)

Judge Fallon's opinion addressed the same arguments raised in this motion in limine when she denied JHU's motion to exclude the PAT Surveys in their entirety. I will deny JHU's motion to exclude the quantitative data for the same reasons Judge Fallon denied its request to exclude the PAT surveys:

> Regardless of the accuracy of the numerical data set forth in the PAT Surveys, the decision by the ASRS to survey the use of these procedures each year is relevant to the question of whether the non-infringing procedures are unusual, far-fetched, illusory, impractical, occasional aberrant, or experimental. (11/15/17 Tr. at 33:1-5) The body of retinal surgeons participating in the PAT Surveys supports the reliability of the data, as does the evidence on the record showing that ASRS members rely on the PAT Surveys when writing articles for medical

publications. (D.I. 227, Ex. 12 at 6, 9; Ex. 13 at 1-2; Ex. 11 at 1048; Ex. 14 at ALCONMIVS0686903; D.I. 236, Ex. 23 at 62; Ex. 24 at 735, 740; Ex. 25 at 139, 145; Ex. 26 at 1838; Ex. 27 at 1448; Ex. 28 at 975) . . .

Given that the PAT Surveys are not being offered for numerical precision, the fact finder may consider retinal surgeons' use of non-infringing procedures in conjunction with the market share of Alcon's Accused Products to arrive at a conclusion regarding whether the use of the Accused Products during these non-infringing procedures is "substantial."

. . . The fact finder must therefore weigh the PAT Surveys in conjunction with the record as a whole to determine whether JHU has met its burden to prove the lack of substantial non-infringing uses.

. . . Ryan's concession that the surveys are not quantifiably representative of U.S. surgeons, and are not processional surveys, should therefore be weighed by the fact finder. (D.I. 224, Ex. 21 at 78:3-8; Ex. 20 at ¶ 35)

(Doc. No. 294, at 17, 18, 21.)

This analysis of PAT Surveys as a whole applies equally as well to the narrower issue of their quantitative data. Therefore, I agree with Alcon that "[t]he jurors can do what jurors are asked to do—use the most credible and useful evidence." (Doc. No. 275, at 22.) I will deny this motion because it presents an issue of weight rather than admissibility.

7. **Denied:** **"Defendants Should Be Precluded from Presenting Any Documents or Testimony About Dr. Ryan's 'Retrospective Study' Produced After September 1, 2017"**

JHU argues for the exclusion of "documents produced by Dr. Ryan in January, February and April of 2018 concerning Dr. Ryan's study." (Doc. No. 348, at 24.) Dr. Ryan's deposition occurred on the same day discovery closed, September 1, 2017, and JHU argues that documents submitted after that date (1) "were produced far too late for JHU to take the necessary discovery to develop its responsive case" and (2) were

"selectively incomplete, hampering JHU's ability to cross-examine Dr. Ryan at trial." (Id.)

Dr. Ryan's study, which he began undertaking before this litigation, sought to determine "whether vit-buckle procedures produce better surgical outcomes, and if so, for which types of patients." (Doc. No. 375, at 24–25.) Alcon does not dispute that Dr. Ryan turned over certain materials after the close of discovery, but argues that the information did not exist before the close of discovery. (Id. at 24.) "Data collection [for the study] did not close until after Dr. Ryan's deposition. Dr. Ryan has since then published his preliminary conclusions; produced those conclusions to JHU; and made himself available for JHU to take another (third) deposition." (Id. at 25.)

The parties have undergone extensive conversations regarding how to reconcile this issue but have not reached a resolution. (Doc. No. 359, Ex. 8 (e-mail conversation among counsel, from Sept. 11, 2017 through May 8, 2018).)

JHU argues that Federal Rule of Civil Procedure 26[2] prohibits Alcon from relying on Dr. Ryan's "untimely and incomplete supplementation" of materials. (Doc. No. 348, at 26.) Rule 26 requires that expert witnesses disclose a report containing "the facts or data considered by the witness" at least 90 days before trial. Fed. R. Civ. P. 26(a)(2)(B),(D). If a party fails to disclose information required by Rule 26, the party

---

[2] Rule 26 mandates disclosure of:

> a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed. R. Civ. P. 26(a)(1)(A)(ii).

may not use that information unless the failure was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1).

Alcon responds that it complied with JHU's subpoenas and that "JHU cannot now construe [its requests, which Alcon purportedly fulfilled] to inappropriately nullify Rule 26." (Doc. No. 375, at 26.) Further, Alcon responds that it offered JHU a third deposition of Dr. Ryan and that JHU has not shown prejudice because of Dr. Ryan's disclosures that came after the close of discovery. (Id. at 27.)

Notably, trial has been pushed back in this case and is currently pending rescheduling, allowing more time to address this issue. At this time, I will deny this motion, and I will encourage the parties to resolve this between themselves, perhaps by scheduling an additional, narrowly-focused deposition with Dr. Ryan. If the issue remains unresolved, the parties may address it at a later date with the trial judge.

8. **<u>Denied:</u> "Defendants Should Be Precluded From Introducing Their Own Patents Into Evidence As Well As Undisclosed Expert Opinion Testimony That Defendants' Accused Products Practice Their Patents."**

JHU requests (1) "precluding Alcon from introducing evidence that Alcon owns patents covering the accused products," and (2) "the exclusion of any undisclosed expert opinion testimony, in particular from Mr. Barry Copeland, seeking to link the claims of patents assigned or licensed to Alcon to the Alcon products in this action." (Doc. No. 348, at 28.)

### a. Alcon's Patents

JHU notes its previous (and overlapping) "*Daubert* motion to exclude Alcon's disclosed experts from offering opinions that the accused products practice Alcon's patents because those opinions had no analytic support." (Id.) On that issue, Judge Fallon concluded as follows:

> JHU alleges that Alcon's expert opinions regarding whether the Accused Products are associated with Alcon's patents lack analytical support. However, under 35 U.S.C. § 287, patentees "may give notice to the public that the same is patented . . . by fixing thereon the word 'patent' . . . together with the number of the patent . . . ." Alcon has demonstrated that the Accused Products were marked with the numbers of its patents, establishing that the Accused Products were publicly identified as being covered by Alcon's patents. (D.I. 227, Ex. 2 at 68:5-17; 6/16/16 Tr. at 13:23-14:8) Consequently, JHU's motion to exclude is denied with respect to whether the Accused Products practice Alcon's patents.

(Doc. No. 294, at 24.)

JHU differentiates the issue in Judge Fallon's ruling and the request in this motion by noting that Judge Fallon "was not asked to consider Rule 403, the admissibility of the patents themselves, or the admissibility of then-undisclosed expert opinions." (Doc. No. 348, at 28.)

Alcon responds that JHU's own expert, Dr. Awh, opined on Alcon's patents and confirmed that Alcon's products were covered by Alcon's patents. (Doc. No. 375, at 29; see Doc. No. 376, at 17–18 (Awh deposition).) Further, Alcon argues, Dr. Napper relies on Dr. Awh's testimony for his damages calculations. (Doc. No. 375, at 29.) Additionally, Mr. Napper uses the "entire market value rule," and "Alcon's expert, Julie Davis, explains why Alcon's patents involve features that independently drive sales, precluding the use of the EMVR." (Id. at 30.) Further, Alcon notes that Dr. D'Amico

"included and cited to Alcon patents in his expert report, and JHU questioned him about them." (Id.)

In addition to the patents' relevance to the damages analysis, Alcon claims the patents are relevant "to rebut JHU's charge that Alcon willfully infringed JHU's method claims." (Id. at 31.)

Regarding JHU's first request in this motion in limine—that I preclude Alcon from introducing evidence that it "owns patents covering the accused products"—I am denying this request pursuant to both Judge Fallon's report and Rule 403. Alternatively, to the extent that JHU is more narrowly requesting that I preclude Alcon from "introducing the patents themselves into evidence," I am denying that request for the same reasons.

JHU also requests a limiting instruction to clarify that Alcon's patents on the accused products provide "absolutely no defense to JHU's claim of infringement." (Doc. No. 348, at 30.) At this stage, I will deny this request because the issue is too speculative. I will instead ask that JHU raise this issue at trial if it becomes necessary.

### b.  Mr. Copeland's Testimony

Next, I will address JHU's second request in this motion—that "Mr. Copeland should not be permitted to discuss Alcon's patents or opine that those patents are practiced by Alcon's accused products because such testimony would require undisclosed expert analysis." (Doc. No. 348, at 30–31.) JHU argues that an expert would be necessary to testify that Alcon's surgical tools are indeed used to practice the patents whose numbers are marked on those tools—and that because Mr. Copeland was not designated

an expert on this matter, he should be precluded from testifying pursuant to Federal Rule of Civil Procedure 26(a)(2) and Federal Rules of Evidence 702 and 801. (Id. at 31.) JHU argues that "[p]lainly, Alcon's marking documents themselves do not provide sufficient facts, data, or indicia that reliable principles or methods were applied in concluding that the accused products practice Alcon's patents." (Id.) "Because Alcon refused to provide any information explaining how its accused products practice its patents, despite an order compelling disclosure of this information, any effort by Alcon to backfill its case through Mr. Copeland would be prejudicial to JHU, contrary to the Court's motion to compel ruling and Rule 403, and should not be permitted." (Id.)

Alcon responds that Mr. Copeland would not be offering an expert opinion. "Mr. Copeland, as a member of Alcon's in-house legal team, is well aware from his tenure of Alcon's patent practices and the accused products; and can affirm the accuracy of Alcon's patent listings if JHU is now permitted to newly contest the issue." (Doc. No. 375, at 30.)

At this stage, without the context of trial, I cannot determine whether Mr. Copeland's potential testimony would exceed his capacity as a fact witness, but it does not appear that it would. Therefore, at this time, I will deny this motion.

### C. Alcon's Motions in Limine

> **1. Denied: "Motion to Preclude JHU from Confusing the Legal Distinction Between Method and Apparatus Claims When Describing the Claimed 'Invention' and Products"**

Alcon moves to preclude "JHU from offering any testimony or arguments suggesting that the '848 patent covers Alcon's or any other products; that Alcon copied

any method or product; or otherwise blurring the distinction between the patented method and unpatented products." (Doc. No. 349, at 4.) In support of its motion, Alcon notes that the '848 patent concerns surgical *methods*, not devices, and that Alcon did not *directly* infringe on the '848 patent with its surgical tools (as Judge Fallon ruled on summary judgment). (Id. at 2 (emphasis added) (citing Doc. No. 294, at 24–26).)

Specifically, Alcon seeks to (1) preclude JHU's "named inventors" from detailing their "instrument design efforts" while summarizing how their patented method came to be, and (2) preclude JHU's expert, Dr. Awh, from testifying that "the claims are non-obvious given secondary considerations evidence that Alcon 'copied' the invention." (Id. at 3.) Alcon argues that such evidence should be excluded under Rule 403 because it risks confusing or misleading the jury. (Id. at 2.)

First, I will address Alcon's general argument; then, I will address Alcon's two specific requests for exclusion. As noted above, Alcon moves generally to preclude "JHU from offering any testimony or arguments suggesting that the '848 patent covers Alcon's or any other products; that Alcon copied any method or product; or otherwise blurring the distinction between the patented method and unpatented products." (Doc. No. 349, at 4.) Direct infringement by Alcon is not at issue in this case because Alcon is a "medical device manufacturer" that does not perform surgeries—and therefore cannot perform the patented methods.[3] (Doc. No. 294, at 24–26.)

---

[3] JHU argues in its response to Alcon's motion in limine that the '848 patent "describes and claims not only a surgical method, but also specific surgical instruments used in performing the surgical method." (Doc. No. 377.) This statement by JHU bolsters rather than rebuts Alcon's argument. By this statement, JHU seems to be fostering the impression that the patent covers surgical tools. The patent covers a method, not

While it is true that testimony or arguments wrongfully suggesting that the '848 patent covers tools as well as methods would be misleading, this request for exclusion is so general that I must deny it to avoid throwing the baby out with the bathwater. Alcon may object to such confusing or misleading testimony at trial.

Next, I will address Alcon's more specific arguments. First, Alcon claims that allowing JHU inventors to tell an "instrument-driven" narrative of their invention of a surgical method would risk confusing the jury, among other Rule 403 considerations. (Doc. No. 349, at 3.) JHU responds that there is "nothing confusing" about the inventors describing the instruments as part of their testimony. (Doc. No. 377, at 2.) I agree with JHU that there is nothing inherently confusing about the inventors describing the surgical tools in their testimony. In fact, it may prove difficult or impossible for them to describe the method without also discussing the tools.

Lastly, I turn to Alcon's second specific argument, that Dr. Awh should be precluded from testifying, as part of his secondary considerations evidence,[4] that Alcon "copied" the invention. (Doc. No. 349, at 3.) Alcon does not provide a citation to the specific portion of the record it seeks to exclude from trial. To the extent that Alcon raises an issue beyond what was addressed on summary judgment; it should do so more specifically at trial. For now, it suffices to say that any testimony that would contradict Judge Fallon's ruling on direct infringement would clearly be improper.

---

tools. This basic fact is beyond dispute. Tools are described in the patent only to the extent that they help to explain the patented method; they are not themselves patented. (See Doc. No. 358, Ex. 6.)

[4] Secondary considerations evidence is addressed more fully in my analysis of Alcon's second motion in limine below.

**2. <u>Denied</u>: "Motion to Exclude JHU's 'Secondary Considerations' Evidence Lacking Nexus to the Asserted Method Claims"**

Alcon seeks to exclude evidence of "'secondary considerations' (industry praise, long-felt need, skepticism, licensing, copying, commercial success and unexpected results)" that JHU uses to show that the '848 patent is not obvious. (Doc. No. 350, at 1.) Alcon provides individual examples of this broad category of evidence from Dr. Awh's expert report. (<u>Id.</u> at 2–4.)

Such evidence, Alcon argues, would confuse or mislead a jury because it covers "non-patented *product* features" and "lacks nexus to the claimed *method*." (<u>Id.</u> at 1.) Alcon argues that there must be a "nexus" between evidence of secondary considerations and the "merits of the claimed invention." (<u>Id.</u>)

JHU responds that "Alcon's argument ignores that this is an indirect infringement case the focus of which is Alcon's instruments." (Doc. No. 378, at 1.) This statement by JHU points to the inherent and unavoidable logical challenge of this case; this case involves indirect infringement of a patented method, and such infringement necessarily involves tools, though the tools themselves are not patented.

Alcon's motion in limine attempts to sidestep this unavoidable challenge of maintaining a jury's focus on the alleged infringement of a patented *method* while acknowledging that the method requires *tools* to perform it. I will deny this motion because granting it would mean using an axe in place of a scalpel. It would be more appropriate for Alcon to object at trial to any improper "secondary references" testimony.

**3. Denied: "Motion to Exclude Royalty Theories Regarding Licensing Practices; and Based on Untimely and/or Undisclosed Opinions"**

This is essentially two separate motions in limine. Alcon moves to exclude the 9% royalty rate in Mr. Napper's expert report on damages and moves to exclude Mr. Napper's supplemental report submitted on April 18, 2018. (Doc. No. 351, at 1.)

Regarding the 9% royalty rate, Alcon argues that "[e]xpert opinions based on license terms not tethered to the claimed technology and product market are properly excluded as being misleading and confusing to the jury." (Id. at 2.) However, Mr. Napper's report provides ample analysis as to how he arrived at the 9% rate, emphasizing Alcon's reduced risk compared to B&L, which paid a 5% royalty rate. (Doc. No. 358, Ex. 3, at 95 (Mr. Napper's report).) After reviewing Alcon's motion in light of Mr. Napper's report, I find that this is an issue of weight rather than admissibility.

Turning to Mr. Napper's supplemental report, Alcon argues that it should be excluded as untimely. (Doc. No. 351, at 4.) However, JHU responds that the supplemental report does not provide new opinions. It merely updates Alcon's sales and damages in advance of a then-scheduled May 2018 trial, and it substitutes "Market Scope" data regarding market shares, which was eliminated on summary judgment, with "Alcon's Demand Pulse market share data." (Doc. No. 379, at 4; Doc. No. 358, Ex. 12 (Mr. Napper's supplemental report).) Additionally, JHU notes, those market share calculations are "Alcon's own" and are undisputed. (Doc. No. 379, at 4.) The apparent purpose of this supplemental report is to bring the litigation up to date, not to provide a

new opinion, and I fail to see how this report would prejudice Alcon. Therefore, at this stage, I will deny this motion in limine.

> **4. <u>Denied:</u> "Motion to Exclude Evidence Irrelevant Post-Summary Judgment: Evidence Outside the Statute of Limitations; on Foreign Marketing; or Damages Theories Based on Direct Infringement Assumptions"**

This motion in limine is essentially three packaged as one. Alcon moves to exclude (1) evidence outside the statute of limitations, (2) evidence of Alcon's foreign marketing efforts, and (3) Mr. Napper's damages model. I will address each in turn.

### a. Evidence Outside the Statute of Limitations

Alcon notes that Judge Fallon's report "held that JHU could not advance a ***direct*** infringement theory relying on activity beyond the statute of limitations period." (Doc. No. 352, at 1–2 (citing Doc. No. 294, at 26).) JHU agrees. (Doc. No. 380, at 1.) However, Alcon states that *indirect* infringement similarly requires that the "inducing or contributory acts, and a corresponding directly infringing act" all occur within the statutory period. (Doc. No. 352, at 2.)

Neither case cited by Alcon directly supports this proposition. (<u>See id.</u> (citing <u>A. Stucki Co. v. Buckeye Steel Castings Co.</u>, 963 F.2d 360, 363–64 (Fed. Cir. 1992); <u>Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., Ltd.</u>, 754 F.2d 345, 348–49 (Fed. Cir. 1985)).) In <u>A. Stucki Co.</u>, unlike here, the patentee did not complain of "*any act* [within the 35 U.S.C. § 286 statute of limitations] that in any way constituted, induced, or contributed" to the alleged infringement. 963 F.2d at 363–64 (emphasis added). In <u>Standard Oil Co.</u>, the court noted that § 286 does not prohibit actions based on

events that took place more than six years before the complaint was filed, it merely "counts *backward* [six years from the complaint] to determine the date before which infringing *acts* cannot give rise to a right to recover damages." 754 F.2d at 348. Thus, as JHU argues, § 286 is not a true statute of limitations but is instead a limitation on damages. (Doc. No. 380, at 2.)

JHU further argues that evidence before the damages period is relevant both to willfulness and to the "'hypothetical negotiation' use to determine a reasonable royalty," which would involve earlier interactions among the parties. Id. at 3.

I am not convinced that evidence that falls outside the statutory damages period is wholly irrelevant to this case. Therefore, I will deny this motion in limine because granting it would risk overinclusivity.

### b. Alcon's Foreign Marketing

Alcon argues that, in order to be relevant, marketing activity must be domestic. (Doc. No. 352, at 2 (citing 35 U.S.C. § 271(c)).) Therefore, Alcon seeks to exclude the portion of Dr. Haller's expert report that "invoked marketing materials and internal plans for Alcon's ***non-U.S.*** markets." (Id. at 3.) Alcon argues that such materials are irrelevant and would confuse a jury. "[A]bsent causal links between the alleged induced acts of direct infringement in the U.S., Alcon's activity *outside the U.S.* cannot show intent to induce ***within the U.S.***" (Id.)

The cases cited by Alcon again fall short of supporting its argument. They establish that, for induced infringement liability, the defendant's alleged inducement must have *actually caused* the direct infringement by a third party. See e.g., GlaxoSmithKline

LLC v. Teva Pharmaceuticals USA, Inc. No. 14-878-LPS-CJB, 2018 WL 1517687, at *5 (D. Del. Mar. 8, 2018). But none of Alcon's cited cases differentiate between the admissibility of marketing activity outside versus inside the United States.

JHU responds that while "*direct infringement* is limited to the U.S.," actions abroad are relevant to induced infringement. (Doc. No. 380, at 3.) JHU cites Merial Limited v. Cipla Limited, a Federal Circuit case that provides the following guidance on this issue:

> To be sure, purely extraterritorial conduct cannot constitute *direct* infringement of a U.S. patent, as § 271(a) [which governs direct infringement] includes express language limiting its scope to domestic acts. . . . [Section] 271(b) [which governs induced infringement] contains no such territorial proscription. . . . Section 271(b) therefore does not, on its face, foreclose liability for extraterritorial acts that actively induce an act of direct infringement that occurs within the United States.

Merial Limited v. Cipla Limited, 681 F.3d 1283, 1302 (Fed. Cir. 2012).

At this stage, I am not convinced that Alcon's conduct abroad is irrelevant for all purposes, and I will accordingly deny this motion.

### c. JHU Expert's Direct Infringement Damages Theory

Alcon seeks to preclude Mr. Napper's testimony to the extent it is based on a theory of direct infringement by Alcon.[5] Alcon argues that "JHU's damages expert, Mr.

---

[5] Alcon quotes the following portion of Mr. Napper's report:

> Both standalone **instruments** and standard vitreoretinal **packs** are **directly accused of infringement** and have no substantial non-infringing use. Thus, I understand the entire accused products are covered by the asserted method claims.
> . . .
> [T]he **directly accused portions of the pack**, that being the **accused small gauge devices** used for vitrectomy procedures, are the driver of the sale of the packs.

(Doc. No. 352, at 3 (quoting Doc. No. 358, Ex. 3, at 100, 102).)

30

Napper, based his entire damages theory on the assumption that Alcon's instruments and packages directly infringed," which would be problematic because the direct infringement claim was eliminated on summary judgment. (Doc. No. 352, at 3; Doc. No. 294, at 24–26.)

JHU responds that Mr. Napper's damages model is appropriately based on Alcon's indirect infringement and thus was not impacted by the summary judgment ruling. (Doc. No. 380, at 4.)

I will deny this motion in limine because it appears to address the direct infringement issue that Judge Fallon already decided, albeit from a different angle. Direct infringement is no longer an issue in this case; evidence to the contrary would be inappropriate and impermissible, for both liability and damages.

5. **Denied: "Motion to Exclude Irrelevant and Prejudicial Exhibits Concerning Competitive Analysis"**

In this motion, Alcon seeks to exclude the following "categories of documents": (1) e-mails from 2014–16, at PTX24, PTX26, and PTX30, (2) documents related to the "unauthorized attendance of a foreign employee at Grieshaber (a company Alcon acquired) at a Bausch & Lomb ("B&L") Symposium in 2010," at PTX119 and PTX668–74, and (3) evidence related to Alcon's efforts "to acquire products sold by B&L and Synergetics (another competitor later acquired by B&L) in 2012," at PTX667. (Doc. No. 353, at 1.) In the analysis below, I will combine categories 2 and 3 because Alcon addresses them as one in its motion.

### a. Category 1

Alcon moves to exclude three e-mails, labeled PTX24, PTX26, and PTX30. (Doc.

No. 353 (citing the e-mails at Doc. No 358, Ex. 26 (PTX24), Ex. 27 (PTX26), Ex. 28

(PTX30)).) Alcon describes these communications as follows:

> PTX 24 is a July 2015 email exchange between Alcon consultant Dr.
> Stephen Charles and employee Paul Hallen discussing a vitreous cutter
> product. (Ex. 26, PTX 24). Dr. Charles references the competitor cutters
> and ends, "[w]e need to leapfrog the competition." (*Id.* at PTX24.02). In the
> second to last email, Dr. Charles states that "[w]e have to destroy DORC,
> B&L, Geuder and Optikon!!!" (*Id.* at PYX24.01). PTZ 26 is an email string
> between Dr. Charles and Alcon employee Josh Anderson from March 2016
> that relates to B&L's acquisition of Synergetics' portfolio of products. (Ex.
> 27, PTX26). Dr. Charles concludes the email with, "[w]e must drive B&L
> and DORC to their total destruction." (*Id.* at PTX26.01). PTX 30 is an
> email string between Dr. Charles, Mike Lee (an Alcon employee), and
> others at Alcon from April of 2014 that relates to new Synergetics products.
> (Ex. 28, PTX 30). At the end of the string, Dr. Charles states, "[w]e need to
> punish them." (*Id.* at PTX30.01).

(Doc. No. 353, at 2.)

Alcon argues that these emails are irrelevant because they do not reference JHU,

the '848 patent, "surgery across the conjunctiva," the claims at issue in this case, or the

damages at issue in this case. (Id.) Instead, they merely "illustrate individuals facing a

competitive marketplace and using colorful language to rise to the competitive

challenge."(Id.) Plus, Alcon notes, B&L is not even a party to this action. (Id. at 3.)

Alcon argues that these e-mails therefore "present a substantial danger of confusing the

issues, misleading the jury, and unfairly prejudicing Alcon." (Id.)

JHU responds that it was an objective of Alcon "to target customers using B&L's

small-gauge products and try to convert those accounts to Alcon's MIVS (i.e., 23-, 25-,

and 27-gauge) instruments for use in performing the claimed method." (Doc. No. 381, at

1–2.) Therefore, the three e-mail exchanges at issue are relevant evidence of "Alcon's

efforts to implement the conversion directive." (Id. at 2.) With that, JHU argues that this

evidence is relevant to induced infringement and willfulness. (Id. at 3.) JHU also argues

that these e-mails show Dr. Charles's bias toward Alcon, which will be relevant in

weighing his "opinion letters as a defense to inducement and willfulness." (Id. at 3.)

In conclusion, I find that these e-mails are relevant and that their probative value is

not "substantially outweighed" by a danger of unfair prejudice. Accordingly, I will deny

the motion in limine for this category of evidence.

### b. Category 2

Alcon moves to exclude PTX119 and PTX667–74 and summarizes these

communications as follows:

> PTX119 and PTX668 through PTX674 relate to the attendance of a
> Switzerland-based Grieshaber employee at a European B&L Symposium in
> 2010 where he, along with several hundred invited surgeons, saw
> presentations on equipment that B&L was introducing to market. PTX 119
> is am email noting that Neils Abt "was the only one [associated with
> Grishaber] to get in the room." (Ex. 29, PTX119 at PTX119.01). PTX668 is
> Mr. Abt's September 9, 2010 email that summarizes major points involving
> B&L's claims about how B&L's equipment performed. (Ex. 30, PTX668).
> PTX669 through PTX674 are pictures Mr. Abt took during the symposium.
> (Ex. 31, PTX669 through PTX 674).
> PTX667 is an email exchange from 2012 that relates to acquiring
> products from B&L and Synergetics on the open market. (Ex. 32, PTX667
> at PTX667.04). The first email in the string from D. Mazzetti states, "I'm
> sending to your attention a Stellaris PC 23G wide angle illuminator
> (BL5823) and a Synergetics 25G high flow  infusion chandelier…." (*Id.*)
> Ms. Mazzetti later agreed to send the probe so that it could be tested. (*Id.* at
> PTX667.01–02).

(Doc. No. 353, at 3.)

Alcon argues that these documents are irrelevant because they involve surgical tools, not the patented surgical method. (Id.) JHU responds that these e-mails and photos "illustrate the great lengths to which Alcon has gone to learn about B&L's newest small-gauge products and the value Alcon places on competing in the small gauge market." (Doc. No. 381, at 4.) "Given Alcon's trial strategy of diminishing the value of the patented invention, and its argument that its success in the small-gauge market is due entirely to innovations it made to its instruments, the jury is entitled to weigh the evidence Alcon is seeking to exclude in assessing the veracity of Alcon's arguments." (Id.)

At this time, I am not convinced that this evidence is entirely irrelevant. Therefore, it would be premature to exclude it, and I will deny this motion in limine.

### 6. **Denied:** **"Motion to Preclude JHU's Experts From Opining on Alcon's Corporate State of Mind"**

A defendant's "knowledge" of the patented method is an element of both induced and contributory infringement. (Doc. No. 354, at 1.) Alcon moves to exclude testimony by JHU's witnesses, specifically by Dr. Julia Haller, that speaks to "the corporate state of mind of Alcon, or its employees." (Id. at 2.) This category of evidence is quite broad, and Alcon's citations of allegedly problematic testimony also cover a wide range.

Although Rule 704 permits expert testimony that "embraces an ultimate issue," expert witnesses are "prohibited from rendering a legal opinion." Berckeley Investment Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006).

Alcon specifically quotes the following two passages from Dr. Haller's expert report as improperly "opining on what Alcon or its employees were thinking or intending." (Doc. No. 354, at 3.)

- "Defendants also produced marketing materials . . . that show that the ***intended purpose*** of the Accused Products is to perform the method of the Asserted Claims."
- "Because the Accused Products are very rarely used for anything other than performing the method of the Asserted Claims, ***the objective of this promotional piece*** was and remains to encourage surgeons to perform the Asserted Claims."

(Id. (citing Doc. No. 358, Ex. 1 ¶¶ 469, 491).)

JHU responds that "Dr. Haller will not offer opinions at trial about what Alcon thought or believed, including whether Alcon knew the '848 method was patented or whether Alcon intended for surgeons to infringe." (Doc. No. 382, at 1.)

In a footnote, Alcon points out paragraphs 7 and 8 of Dr. Haller's expert report, where she states that Alcon has "contributed" and "induced" infringement of the '848 patent. (Doc. No. 358 Ex. 1 ¶¶ 7–8.) These statements are clearly legal conclusions. I will presume, based on JHU's response, that it agrees to this basic assessment and will not introduce such testimony at trial. However, if it becomes necessary, Alcon should make appropriate objections at trial.

Specifically addressing the two quotations bulleted above, JHU responds that these passages are not opinions about Alcon's state of mind. (Id. at 3.) The first quotation, JHU argues, "is an explanation of the surgical method Alcon promotes and

encourages for its accused MIVS instruments." (Id.) "Dr. Haller's opinion, based on this and other evidence, that the intended and promoted use of the accused products is the same method claimed in the '848 patent is a permissible and typical expert opinion in patent cases." (Id.)

As for the second bullet point, JHU argues that the "objective" is not a matter of Dr. Haller's opinion but a restatement of Alcon's own materials. (Id. at 3–4.) Alcon's own marketing slide, referenced in paragraph 493 of Dr. Haller's expert report, reads: "MIVS Objective, Convert surgeons to our MIVS portfolio . . ." (Doc. No. 358 Ex. 1 ¶ 493.)

I will deny this motion in limine because the two statements quoted above, viewed in the context of Alcon's own marketing materials, are not improper opinions by an expert and are not legal conclusions.

**7. Denied: "Motion to Exclude Evidence Associated with JHU's Willful Infringement/Intent Allegations"**

Alcon argues that the evidence advanced by JHU to support a claim of willful infringement is inadmissible. (Doc. No. 355, at 1–2.) It bases its argument on several grounds, which I have analyzed in turn, as labeled below.

**a. Rule 407**

Alcon argues that Rule 407, which addresses subsequent remedial measures, precludes evidence (1) that "Alcon's in-house counsel subsequently suggested changing

to 23-gauge instruments" and (2) that "Paul Hallen engaged with JHU or Dr. de Juan about licensing in 2009 and 2014." (Id. at 2.) Rule 407 provides:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> - negligence;
> - culpable conduct;
> - a defect in a product or its design; or
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment . . . .

Fed. R. Evid. 407.

JHU responds that Rule 407 is not controlling here because no remedial measure was taken. (Doc. No. 383, at 2.)

> While Mr. Copeland certainly recommended that Alcon stop selling the accused 25-gauge products both before and after he helped draft and received the opinions of counsel, Alcon kept right on selling these accused products. This is not evidence of a subsequent remedial measure. Instead, it is evidence that (1) the opinion recipient had no faith in the opinions he helped prepare; (2) the opinion recipient believed Alcon was infringing; (3) the claimed invention is valuable and important; and (4) Alcon placed its profits over respect for JHU's intellectual property.
>
> . . .
>
> In 2009, Mr. Hallen contacted the JHU Technology Transfer office. Falsely representing himself as being with a company called H2A, not Alcon, he inquired about a license to the '848 patent. (D.I. 202, Ex. 11.) Mr. Hallen's belief that the patent was already licensed to Bausch & Lomb ("B&L") was confirmed, and he was told a license might be available from B&L. Mr. Hallen concluded that B&L would never sublicense its direct competitor, Alcon, and his license efforts ended. (D.I. 198 Ex. F17, Hallen Dep. Tr. at 187:4-188:13.) . . . Mr. Hallen's conduct in 2014 was no better. Dr. de Juan contacted Mr. Hallen and told him that a license to the '848 patent might be

available from JHU. Dr. de Juan connected Mr. Hallen with Emily
Williams in JHU's Technology Transfer office. (Ex. L, JHU0003693.) No
follow up occurred.

(Id. at 3.)

Neither Alcon's in-house counsel's suggestion regarding 23-gauge products nor

Paul Hallen's fruitless conversations with JHU are subsequent remedial measures. Under

Rule 407, subsequent remedial measures are measures that are "taken" that "would have

made an earlier injury or harm less likely to occur." See Fed. R. Evid. 407. Here, neither

example is a measure that was taken[6]—and Alcon has not shown that further follow-

through would have mitigated the alleged infringement. In conclusion, Rule 407 does not

support the exclusion of this evidence.

### b. Rule 401

Alcon argues that its attorney's suggestion of using 23-gauge instruments is

irrelevant under Rule 401. "None of JHU's asserted claims are limited to 25-gauge

products or methods; JHU also accuses Alcon's 23-gauge products of infringement in this

litigation." (Doc. No. 355, at 3.) I conclude that it would be inappropriate to exclude this

evidence for all purposes based on irrelevance before seeing how it is used at trial.

---

[6] In the three cases Alcon cites to support its Rule 407 argument, remedial measures were actually taken,
unlike here where they were not. (Doc. No. 355, at 2 (citing Pall Corp. v. Micron Separations, Inc., 66 F.3d
1211, 1222 (Fed. Cir. 1995); Deflecto, LLC v. Dundas, No. 13-0116-CV-W-ODS, 2015 WL 9413148, at
*2 (W.D. Mo. Dec. 22, 2015); Interactive Health LLC v. King Kong USA, Inc., No. 06-1902-VBF(PLAx),
2008 WL 11339129, at *7–8 (C.D. Cal. July 24, 2008))).

### c. Rule 408

Alcon argues that Rule 408 precludes evidence of Mr. Hallen's licensing

negotiations with JHU because "efforts to resolve claims are inadmissible." (Doc. No.

355, at 3.) Rule 408 provides:

> **(a) Prohibited Uses.** Evidence of the following is not admissible – on
> behalf of any party – either to prove or disprove the validity or amount
> of a disputed claim or to impeach by a prior inconsistent statement or a
> contradiction:
>
> > **(1)** furnishing, promising, or offering--or accepting, promising to
> > accept, or offering to accept--a valuable consideration in
> > compromising or attempting to compromise the claim; and
> >
> > **(2)** conduct or a statement made during compromise negotiations
> > about the claim – except when offered in a criminal case and
> > when the negotiations related to a claim by a public office in the
> > exercise of its regulatory, investigative, or enforcement authority.
>
> **(b) Exceptions.** The court may admit this evidence for another purpose,
> such as proving a witness's bias or prejudice, negating a contention of
> undue delay, or proving an effort to obstruct a criminal investigation or
> prosecution.

Fed. R. Evid. 408.

JHU responds that Rule 408 is inapplicable because Mr. Hallen never "discuss[ed]

settlement or offer[ed] any consideration to JHU for Alcon's past or ongoing

infringement of the '848 patent. "Mr. Hallen was not even purporting to act on Alcon's

behalf when he contacted JHU in 2009 and Mr. Hallen did not even bother to follow up

with JHU, if only to say 'we're not interested in licensing,' in 2014." (Doc. No. 383, at

3.)

In conclusion, I find that Alcon has not put forth evidence or arguments to support a finding that Mr. Hallen's conduct constitutes either of Rule 408's categories.

### d. 35 U.S.C. § 298

Alcon argues that 35 U.S.C. § 298[7] prohibits JHU from asserting that Alcon employees, who were unaware of the advice received by outside counsel, acted willfully by not themselves obtaining advice of counsel. (Doc. No. 355, at 3–4.)

JHU responds that § 298 only applies to *defendants* who failed to obtain the advice of counsel, not to defendants like Alcon, who sought such advice. (Doc. No. 383, at 4.) "That Mr. Copeland did not share the opinion letters he helped prepare with the relevant decision makers in the vitreoretinal product group does not implicate Section 298. To the contrary, it shows a lack of good faith reliance on those opinions." (Id.) I agree with JHU that § 298 does not support the exclusion of this evidence.

### e. Timeliness and Substantive Willfulness Argument

Alcon's final argument in this motion, under the heading, "JHU's Post-Complaint Willful Theory is Untimely and Not Viable," is difficult to parse. It seems Alcon is requesting that I remove the claim of willful infringement based on the court's earlier

---

[7]

> The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent.

35 U.S.C. § 298.

claim construction ruling and JHU's untimeliness. This argument appears to be a motion for partial summary judgment on willful infringement.

In response, JHU points to Judge Fallon's summary judgment opinion, which denied Alcon's motion for summary judgment on willful infringement and enhanced damages. Judge Fallon concluded that "[a] reasonable jury considering the factual issues raised by JHU could determine that Alcon did not rely in good faith on the opinions of counsel given that it recommended discontinuing the 25-gauge products, pursued a license of the '848 patent from JHU, and continued to sell the Accused Products even after the court issued its claim construction decision rejecting Alcon's proposed constructions." (Doc. No. 294, at 40.)

A motion in limine is not the proper vehicle by which to eliminate issues from a case. "Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion in limine is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Bradley v. Pittsburgh Board of Ed., 913 F.2d 1064, 1069 (3d Cir. 1990). Treating a motion in limine like a motion for summary judgment would eliminate "the procedural protections of notice which the federal rules require before judgment on the merits may be granted." Id.

I will deny this motion in limine because the elimination of a legal issue is the proper function of a summary judgment motion, and Judge Fallon ruled on this issue at that stage.

8. **Granted in part:** <u>**"Motion to Preclude JHU from Referencing Prior**</u>

    **Alcon Litigation"**

Alcon argues that JHU should be precluded from referencing Alcon's prior

litigation,[8] <u>Advanced Medical Optics, Inc. v. Alcon Laboratories, Inc.</u>, No. 03-

1095-KAJ, 2005 WL 3454283 (D. Del. Dec. 16, 2005). (Doc. No. 356, at 1.)

Alcon bases its argument on Rules 801, 403, and 404.

JHU responds that it "does not intend to affirmatively introduce the

*Advanced Medical* opinion as evidence" of liability. (Doc. No. 384, at 1.) JHU

states that it will only use this prior litigation as impeachment evidence, which will

come into play "if Alcon witnesses testify about Alcon's *general* policies,

practices, procedures, culture, ethics, good faith, or 'good citizenship,' for

example, if an Alcon witness testifies to an Alcon corporate policy of relying in

good faith on the opinions of its patent counsel, respecting the intellectual property

rights of others, or not copying the patented products of its competitors." (<u>Id.</u> at 2.)

By JHU's reasoning, a wide swath of Alcon's testimony could open the door to

this evidence.

Thus, the issue here is the scope of admissibility of Alcon's prior lawsuit as

impeachment evidence. Prior lawsuits against a defendant are "generally

---

[8] In the prior case, a jury found that Alcon had willfully infringed on two patents and that neither patent was invalid. <u>Advanced Medical Optics, Inc. v. Alcon Laboratories, Inc.</u>, No. 03-1095-KAJ, 2005 WL 3454283, at *1 (D. Del. Dec. 16, 2005).

inadmissible," but there are exceptions for impeachment. <u>SEC v. Goldstone</u>, No. 12-0257 JB/LFG, 2016 WL 3654279, at *9 (D.N.M. June 9, 2016).

Last year, this issue arose in another District of Delaware case, <u>Sonos Inc. v. D&M Holdings Inc</u>. There, the plaintiff argued that the defendant "should not be allowed to introduce arguments, testimony or evidence" related to a prior lawsuit involving the plaintiff. <u>Sonos Inc. v. D&M Holdings Inc.</u>, No. 14-1330-WCB, 2017 WL 5633204, at *1 (D. Del. Nov. 21, 2017). The court ruled that "evidence relating to that proceeding may be used only for impeachment of Sonos's witnesses who testified in that proceeding, under Fed. R. Evid. 613, or as substantive evidence of a testifying witness's prior sworn testimony under Fed. R. Evid. 801(d)(1)." (<u>Id.</u>) I agree with this ruling and find that the same limitations on the use of Alcon's prior litigation are appropriate here. These limitations greatly narrow the window of opportunity for JHU to introduce the prior litigation. Therefore, I will grant this motion in limine, in part, subject to the limitations set forth above.

### 9. <u>Denied:</u> "Motion to Exclude JHU Use of Non-Comparable Licenses Against Alcon"

Alcon argues for the exclusion of the 2016 settlement license between JHU and B&L, which resulted from litigation between them. (Doc. No. 357, at 1.) In this case, the 2016 settlement license relates to the analysis of reasonable royalties, which is "determined by a hypothetical negotiation between the parties at a time just before the alleged infringement began (here 2006)." (<u>Id.</u> at 2.)

Settlement agreements are generally disfavored as evidence to support a reasonable royalty calculation. LazerDynamics, Inc. v. Quanta Computer USA, Inc., 694 F.3d 51, 77 (Fed. Cir. 2012) (cited in Alcon's motion). LazerDynamics found a settlement license inadmissible because it was not the "most reliable license" on the record. Id. at 77–78 ("This record stands in stark contrast to that in *ResQNet*, where a lone settlement agreement stood apart from all other licenses in the record as being uniquely relevant and reliable.").

> The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed.

Id. at 77.

However, a license resulting from a settlement agreement may be used to establish reasonable royalty damages in limited circumstances, namely, when it *is* the "most reliable license" in the record. Id. (citing Resqnet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870–72 (Fed. Cir. 2010)).

The crux of Alcon's argument is that the royalty rate established in the 2016 settlement agreement between JHU and B&L is tainted by their litigation and is subject to the outcome of the present litigation between JHU and Alcon. (Id. at 2.) The 2016 JHU/B&L agreement is subject to the present litigation in that it contains a "most favored licensee" clause stating that JHU "shall not grant a license under the '848 Patents to any person or entity on terms that are more favorable than those granted to Bausch." (Doc. No. 358, Ex. 23, at 6.)

44

JHU responds that this motion in limine is essentially a repackaged *Daubert* motion—and such motions were due in October 2017. (Doc. No. 385, at 1.) This motion in limine indeed recycles Alcon's arguments from its objections to Judge Fallon's report & recommendation regarding the royalty base used in Mr. Napper's calculations. (See Doc. No. 300, at 1–2.)

JHU argues in the alternative that the 2016 license should not be excluded and that "the JHU/B&L agreements are the *only* previous licenses to the '848 patent, and both parties' experts agree that the two B&L agreements must be considered together." (Doc. No. 385, at 4.)

On one hand, as Alcon argues, the 2016 licensing agreement *is* tainted by the inherent pressures of litigation and its terms *are* contingent on this case. On the other hand, the 2016 licensing agreement, having replaced the previous agreement, may be the "most reliable license" in the record, or equally important in the context of this case. At this time, without knowing more about how the 2016 licensing agreement will be used at trial (especially in relation to the original licensing agreement between JHU and B&L), I cannot conclude whether the 2016 agreement is the "most reliable license" in the record, or a permissible equivalent. Therefore, at this time, I will deny this motion in limine.

An appropriate order follows.